672 So.2d 78 (1996)
Thomas S. TRAMEL, III, as Sheriff of Columbia County, Appellant,
v.
Runette J. BASS, Appellee.
No. 95-1239.
District Court of Appeal of Florida, First District.
April 19, 1996.
*79 John W. Jolly, Jr. of Parker, Skelding, Labasky, Corry, Eastman & Hauser, Tallahassee, for Appellant.
Mark A. Avera and Sharon H. Proctor of Avera & Avera, Gainesville, for Appellee.
VAN NORTWICK, Judge.
Thomas S. Tramel, III, as the sheriff of Columbia County, appeals an order which, as a sanction, strikes his answer and affirmative defenses and enters a default judgment against him. The trial court imposed this drastic sanction upon its finding that employees of the sheriff "willfully and intentionally" omitted a crucial portion, damaging to the testimony of a deputy sheriff, of a videotape produced in discovery and introduced as evidence in an "intentional and flagrant attempt to mislead" the appellee, Runette J. Bass, and the trial court, "to prevent highly prejudicial and relevant evidence from falling into the hands of [Bass] ...," and "to perpetrate a fraud upon [the trial court] ... in deliberate and contumacious disregard of [the trial court's] authority." Because we conclude that competent, substantial evidence supports the findings of the lower court and that, based on those findings, the lower court did not abuse its discretion in fashioning its sanction against the sheriff, we affirm.

Factual Background and Procedural History
Bass was seriously injured on November 27, 1992, when the car she was driving was struck by another automobile traveling at a high rate of speed. The other car, a brown Lincoln, was being pursued by a Columbia County Deputy Sheriff, Randy Dowling, whose patrol car was equipped with a video camera which had been activated when his car's flashing lights were activated at the commencement of the pursuit. The driver of the Lincoln and his passenger fled the scene of the accident on foot and had not been identified or apprehended as of the date of the compilation of the instant record. The pursuit began in Columbia County, but the accident occurred shortly after the car entered Alachua County.
After the accident, Dowling submitted a police report in which he stated that the pursuit of the brown Lincoln was undertaken after it nearly collided with Dowling's police car. Dowling reported:
At approximately 5:42 P.M. on 11-27-92, I was traveling south on U.S. 441 in the area of the north entrance of Oleano [sic] State Park. This officer noticed a brown two door vehicle in the south bound lane while passing a north bound vehicle. This brown vehicle was in my lane on a collision course with the front of my patrol vehicle[.] I looked at the radar unit and observed the vehicle traveling at 80 m.p.h. I then drove my patrol vehicle off the right side of the road approximately half way into the ditch to prevent a collision with the brown vehicle. The brown vehicle, after passing the north bound vehicle[,] got back into the north bound lane. I then turned around to stop the vehicle and at the same time I turned on my blue lights to stop the vehicle, due to the vehicle speeding and driving reckless[ly] and I was in fear of other peoples [sic] safety.
Approximately a month after the accident, Bass, through counsel, made a public records request seeking, among other things, a copy of the videotape made from Dowling's patrol car. In response, a full copy of the videotape was made available to Bass.
In September 1993, an amended complaint was filed by Bass against the owners of the Lincoln and Tramel. Count I of the amended complaint pertains to the alleged negligence of the owners of the car. Since the default judgment was not entered against the owners, neither these defendants or any allegations regarding Count I are under consideration in the instant appeal.
In Count II of the amended complaint, Bass sought to recover from Tramel damages caused as a result of the negligent pursuit[1] *80 of the Lincoln undertaken by Dowling within the scope and course of his employment with the Columbia County Sheriff's Department. In his answer, Tramel denied any negligent conduct and raised several affirmative defenses, including sovereign immunity.
Discovery commenced during which Bass requested production of a copy of the videotape.[2] A copy was produced, but the produced copy of the videotape differed from the copy obtained by Bass through the public records request in that it omitted the first six seconds of the video. The videotape produced in discovery begins with a scene of Dowling turning around to proceed in the opposite direction from which he was originally traveling. The public records version of the tape, on the other hand, begins with the image of a lone car, the brown Lincoln, approaching and passing Dowling's police car traveling in the opposite direction. On this tape, the Lincoln is not seen passing another car, a third car is not visible, and the approaching car does not threaten to force Dowling off the road. In the public records copy Dowling is then seen driving the shoulder, turning 180 degrees into the opposite lane and proceeding on a chase of the Lincoln for several miles until coming upon the accident scene. In short, the public records copy of the videotape contradicts Dowling's report that he began a pursuit after observing the reckless driving of the Lincoln, while the version of the videotape produced during discovery excludes the contradictory six seconds.
In his deposition Dowling reiterated the facts included in his police report, stating that he first saw the Lincoln when it pulled out to pass another vehicle and placed Dowling "in a collision course" with the Lincoln causing Dowling's police car to "skid into the side of the road because of the sudden way I had to get off the road to prevent the accident...." Dowling also testified that he wanted to stop the Lincoln because he believed the reckless driving exhibited by the passing of the car suggested that public safety was endangered.
Tramel moved for summary judgment. In his motion, the sheriff repeated Dowling's version of the events. In support of his motion, Tramel submitted to the trial court a copy of the videotape recording of the pursuit of the Lincoln. Like the copy produced to Bass in discovery, the videotape filed in support of the motion for summary judgment omitted the first six seconds of the original video recording. In other words, the lower court was also given a videotape recording which begins with Deputy Dowling turning around his patrol car to pursue the Lincoln.[3]
Thereafter, Bass moved for sanctions alleging in part, as follows:
The first six seconds of the complete videotape directly contradicts the incident report and Dowling's deposition testimony.... The inescapable conclusion is that TRAMEL and his representatives willfully, illegally, and with the most contemptuous disregard for the judicial process and the rules of discovery, have hidden and refused to disclose the existence of the additional videotape footage. That additional six seconds of videotape footage, when analyzed in context with Dowling's description of events, directly contradicts and discredits Dowling's version of events and destroys his justification for the pursuit.
* * * * * *
*81 TRAMEL now seeks to intentionally and materially misrepresent the material facts of this dispute by representing in his Motion for Summary Judgment that Dowling was run off the road by the Lincoln.... In addition to intentionally and materially misrepresenting the facts in an attempt to fraudulently induce this court to grant his motion, TRAMEL has attached and submitted to this court an edited videotape from which TRAMEL knows material portions have been omitted or destroyed.
(Emphasis in original).
As a sanction, Bass sought to have Tramel's answer stricken and a default judgment entered against him.
The sheriff withdrew his motion for summary judgment and the cause proceeded to a hearing on the sanctions motion. Tramel claimed that the omission of the first six seconds was an inadvertent copying error; that the original videotape still existed; and that, as of the time of the hearing, the original tape had been made available to Bass. The sheriff argued that the requested sanction was too severe because human error, rather than an intentional deception, caused Bass and the court to receive incomplete copies of the videotape.
The lower court viewed the original videotape and the two shorter versions produced to Bass and filed with the court. It then heard from several witnesses, including the evidence custodian of the Columbia County Sheriff's Department, who had custody of the videotape; Dowling, who continued to maintain that he was nearly run off the road by the Lincoln; William Mayo, an investigator with the Sheriff's Department who investigated the accident and reviewed the original videotape with Dowling at Dowling's home the night following the accident and with other police officers in the weeks following the accident; and Officer Roberts, who on two separate occasions made each of the two copies of the videotape which were produced to Bass in discovery and filed with the lower court. In his testimony, Roberts conceded that the original videotape did not indicate that the Lincoln nearly ran Dowling off the road, but explained that the two copies, made at separate times, each omitted the initial six seconds because of coincidental "operator error." Roberts explained:
There's no conspiracy, there's no wrongdoing, there's no anything [sic] secret here. All this is is [sic] I put one tape in before and hit the record faster than I hit the other one, and my own fault, I didn't back the tape up and review the entire thing to make sure you got it. But there was nothingno wrongdoing, no perjury, no nothing here. This isI mean, it's not a coverup, it just my mistake.
Thereafter, the trial court granted the motion for sanctions, struck Tramel's answer and affirmative defenses and entered a default judgment against the sheriff on all issues of liability. In so doing, the lower court made the following findings and conclusions:
In October 1993, after [Bass] filed suit and in response to a request for production, [Tramel], through his employees, provided to [Bass's] counsel an incomplete copy of the videotape that was missing the first six seconds, with a start time of 18:33:03. This incomplete videotape begins with Dowling's vehicle on the shoulder of the road preparing to turn around, after the oncoming Lincoln has already gone past Dowling's vehicle. Therefore, the incomplete copy of the videotape does not contradict Dowling's version of events contained in his official report.
During the following year, numerous supervisors and administrators of the Columbia County Sheriff's Department viewed the original videotape and never questioned Dowling regarding the obvious contradiction between Dowling's report and the videotape. Investigator Mayo, directed by Sheriff Tramel to perform a full investigation of the incident, was aware of the contradiction but never questioned Dowling regarding the inconsistency or brought that inconsistency to the attention of the superiors.
Deputy Dowling testified under oath in his deposition and at the evidentiary hearing before this Court that the speeding Lincoln ran him off the road. At his deposition, Dowling was shown the incomplete videotape provided to [Bass's] counsel, which was missing the first six seconds.

*82 At no time did he indicate that some portion of the videotape was missing.
In support of his Motion for Summary Judgment filed October 27, 1994, [Tramel] submitted to the court another copy of the videotape, also missing the crucial first six seconds. These first six seconds contain the most important portion of the videotape because they directly contradict the version of events provided by Deputy Dowling in his official report and in his deposition testimony.
At no time prior to [Bass's] Motion for Sanction did [Tramel] notify his own counsel or [Bass] concerning the six seconds of videotape that were omitted.
On January 4, 1995, an evidentiary hearing was held before this Court.... On that date, Defendant Tramel was given an opportunity to explain, by and through his employees, the conduct of his department including the provision of incomplete copies of the videotape to this Court and to counsel for [Bass]. At that hearing, Defendant Tramel's employees explained that the videotape had been miscopied accidentally on two separate occasions, both when a copy was made for [Bass's] counsel, and when a copy was made for [Tramel's] own counsel. The Court did not find this explanation to be credible.
One or more employees of the Columbia County Sheriff's Department, for whose actions Defendant Tramel was responsible, beyond and to the exclusion of every reasonable doubt, willfully and intentionally omitted the first six seconds of the original videotape from copies provided to counsel for [Bass] and this Court. This misconduct evinces deliberate callousness and constitutes a deliberate and contumacious disregard of this Court's authority.
The actions of the Columbia County Sheriff's Department were an intentional and flagrant attempt to mislead [Bass], the Department's own counsel, and this Court regarding the facts surrounding the reason for initiation of the pursuit, and to prevent highly prejudicial and relevant evidence from falling into the hands of [Bass] with which [Bass] could seriously impeach Dowling's version of events. The misconduct of Defendant Tramel, by and through his employees, was an intentional attempt to perpetrate a fraud upon this Court, and was in contumacious disregard of the integrity of the judicial system and the authority of this Court.
This Court recognizes that [Tramel's] conduct was not specifically in violation of any discovery order contemplated by Fla. R.Civ.P. 1.380. However, aware of its inherent power to sanction fraudulent conduct in matters of discovery, this Court will not permit such flagrant and intentional misconduct to go unsanctioned. Furthermore, the outrageous nature of Defendant Tramel's conduct warrants imposition of the severest sanctions against him.
On appeal, Tramel argues that the lower court abused its discretion in entering the default judgment against him (i) because, according to the sheriff, there was no evidence to support the conclusion that Tramel himself was aware of any alteration of the videotape evidence, (ii) because there is no clear and convincing evidence to support the conclusion that any employee of the appellant intentionally altered the videotape, and (iii) because the sanction imposed is too extreme under the circumstances. Although the sheriff does correctly concede that the lower court possesses the inherent authority to impose the sanctions rendered in the instant case, he contends that the instant case is not appropriate for imposition of such draconian measures. We disagree.

Standard of Review
A trial court's decision to impose sanctions involves the exercise of discretion, Mercer v. Raine, 443 So.2d 944, 946 (Fla. 1983), and the trial court must be accorded considerable latitude in dealing with serious abuses of the judicial process. Thus, the trial court's imposition of sanctions are reviewed only for abuse of discretion. Id. In Mercer, the supreme court held that, in reviewing the application of this discretionary power of the trial court, the abuse of discretion test adopted in Canakaris v. Canakaris, 382 So.2d 1197, 1203 (Fla.1980), should apply:
In reviewing the true discretionary act, the appellate court must fully recognize the *83 superior vantage point of the trial judge and should apply the `reasonableness' test to determine whether the trial judge abused his discretion. If reasonable men could differ as to the propriety of the action taken by the trial court, then the action is not unreasonable and there can be no finding of an abuse of discretion. The discretionary ruling of the trial judge should be disturbed only when his decision fails to satisfy this test of reasonableness.
Mercer, 443 So.2d at 946; see also, Commonwealth Federal Savings and Loan Ass'n v. Tubero, 569 So.2d 1271, 1273 (Fla.1990). The Mercer court concluded that such wide discretionary sanction power was necessary because "a trial judge ... sees the parties first-hand and is more fully informed of the situation..." Mercer, 443 So.2d at 945 (quoting Farish v. Lums, Inc., 267 So.2d 325, 327-28 (Fla.1972)); and "it is impossible to establish a rule of law for every conceivable situation which would arise in the course of a trial ... [or] in the discovery process." Id. at 946. This deference is in recognition of the fact that a trial judge sitting as factfinder "hears the testimony of the witness and observes their demeanor and conduct, and is thus in a better position to arrive at true findings of fact than is the appellate court, which is confined in its consideration to the `cold' typewritten transcript...." Pope v. O'Brien, 213 So.2d 620, 621 (Fla. 1st DCA), appeal dismissed, 219 So.2d 695 (Fla.1968); see also, Seijas v. Seijas, 557 So.2d 102, 103 (Fla. 3d DCA 1990) ("The trial court's findings are entitled to the presumption of correctness accorded to trial court judgments where credibility of witnesses is a factor."). We believe that, as Mercer makes clear, it is the responsibility of the trial court, and not the appellate courts, to manage and control the trial process, including the application of sanctions for serious abuses. To justify reversal of sanctions therefore, it must be shown on appeal that "the trial court clearly erred in its interpretation of the facts and the use of its judgment and not merely that the court, or another factfinder, might have made a different factual determination." Mercer, 443 So.2d at 946.

Inherent Authority to Impose Sanctions
The "inherent powers" of a court "to perform efficiently its judicial functions, to protect its dignity, independence and integrity..." Rose v. Palm Beach County, 361 So.2d 135, 136 n. 3 (Fla.1978), necessarily includes the authority to impose appropriate sanctions. See, Malautea v. Suzuki Motor Co., Ltd., 987 F.2d 1536, 1546-6 (11th Cir.), cert. denied, ___ U.S. ___, 114 S.Ct. 181, 126 L.Ed.2d 140 (1993). We recognize that the sanctions imposed in the instant case are severe. In re Estate of Ulm, 345 So.2d 1099, 1100 (Fla. 2d DCA 1977). However, as our supreme court stated in Mercer v. Raine, 443 So.2d at 946 (citations omitted):
[T]he striking of pleadings and entering a default ... is the most severe of all sanctions which should be employed only in extreme circumstances. A deliberate and contumacious disregard of the court's authority will justify application of this severest of sanctions, as will bad faith, willful disregard or gross indifference to an order of the court, or conduct which evinces deliberate callousness.
Thus, a trial court has the inherent authority to impose severe sanctions when fraud has been perpetrated on the court. Tri Star Investments, Inc. v. Miele, 407 So.2d 292, 293 (Fla. 2d DCA 1981); Herold v. Computer Components International, Inc., 252 So.2d 576 (Fla. 4th DCA 1971).[4]
The sheriff argues that, because the lower court found the alteration of the videotape to be a deliberate act on the part of certain department personnel, he cannot be held liable simply by virtue of his office. Tramel contends that section 30.07, Florida Statutes, makes a sheriff "responsible" only for a deputy's negligence and default in execution of duty, but does not hold a sheriff liable for the intentional wrongdoing of a deputy.[5] We believe, however, that this argument *84 misses the point. The lower court has not determined that the deputies' deliberate and intentional act of providing an altered version of the videotape to Bass and to the court constitutes a tort or gives rise to damages for which the sheriff is liable. Rather, default judgment was entered as a sanction for what the trial court found was the perpetration of a fraud on the court by employees of the sheriff. Section 30.07 does not limit the trial court's inherent power to impose sanctions under the instant circumstances.

The Reasonableness of the Sanction
The reasonableness of a sanction depends in part on the willfulness or bad faith of the party. The accidental or negligent destruction of evidence often justifies lesser sanctions directed toward compensating the victims of evidence destruction.[6] The intentional destruction or alteration of evidence undermines the integrity of the judicial process and, accordingly, may warrant imposition of the most severe sanction of dismissal of a claim or defense, the striking of pleadings, or entry of a default. Metropolitan Dade County v. Bermudez, 648 So.2d 197, 200 (Fla. 1st DCA 1994). Thus, in the case of the intentional alteration of evidence, the most severe sanctions are warranted as much for their deterrent effect on others as for the chastisement of the wrongdoing litigant. In National Hockey League v. Metropolitan Hockey Club, Inc., 427 U.S. 639, 643, 96 S.Ct. 2778, 2781, 49 L.Ed.2d 747 (1976), the United States Supreme Court, in upholding the trial court's dismissal of an action for a litigant's repeated discovery violations, observed:
[T]he most severe in the spectrum of sanctions... must be available ... in appropriate cases, not merely to penalize those whose conduct may be deemed to warrant such a sanction, but to deter those who might be tempted to such conduct in the absence of such a deterrent.
A drastic sanction that denies the availability of the court's processes is therefore appropriate to one "who defiles the judicial system by committing a fraud on the court." Aoude v. Mobil Oil Corporation, 892 F.2d 1115, 1118 (1st Cir.1989) (claim dismissed for "fraud on the court" where plaintiff attached a "bogus" agreement to the complaint); see also, Pope v. Federal Express Corp., 138 F.R.D. 675 (W.D.Mo.1990), aff'd in relevant part, 974 F.2d 982 (8th Cir.1992) (action dismissed where plaintiff manufactured alleged note to support claim).

Conclusion
In its written order the lower court in the instant case makes detailed factual findings from which it concludes that the copies of the videotape made available to the plaintiff through discovery and submitted to the lower court in support of a summary judgment motion were deliberately altered to corroborate Deputy Dowling's version of events.[7] In reaching these findings the trial court necessarily made judgments on the credibility of witnesses based upon the court's direct observations. It is not our role as a reviewing court to second-guess these judgments. Further, the trial court's order, we believe, understandably reflects a sense of disappointment and betrayal in the actions of the law enforcement officers appearing before it. In our system of justice, the police often have exclusive, fundamental control over the gathering of the "facts" of a case. Other parties, particularly the courts, must rely upon the framework of the facts developed by the police. This reliance on the factual information developed by the police requires faith *85 that police reports and evidence are objective and accurate. Even the appearance of the preparation of false police reports or the alteration of evidence by the police greatly undermines this trust and hence undermines our system of justice. A knowing alteration or fabrication of evidence by those trusted with enforcing the laws of the state offends the traditional notions of due process of law under the federal and state constitutions. See, State v. Cayward, 552 So.2d 971, 974 (Fla. 2d DCA 1989). In the very least, such alteration of evidence constitutes bad faith.
We find that competent, substantial evidence in the record does support the findings of the lower court that the sheriff's employees intentionally altered the videotape. Given the trial court's findings of intentional fraud on the court and because we cannot conclude that no reasonable person would agree with the lower court's imposition of these severe sanctions against Sheriff Tramel, we find that the lower court acted within its reasonable discretion. We therefore AFFIRM.
MICKLE and BENTON, JJ., CONCUR.
NOTES
[1] We are not expressing an opinion about whether Dowling's pursuit was justified or was in keeping with the policies of Columbia County Sheriff's Department. Nor do we choose to describe Dowling's pursuit as a "hot pursuit." None of these issues, which may have been relevant in Bass's negligence suit against appellant, are relevant in the instant appeal.
[2] In discovery, Tramel also admitted that the videotape produced in response to the discovery request "represents all of the videotape of the incident." The term "incident" was defined in Bass's request for admissions as "the event of November 27, 1992, in which Deputy Randy Dowling of the Columbia County Sheriff's Department attempted to stop a brown Lincoln Mark VII for a traffic violation that culminated in a crash between the Lincoln Mark VII and [Bass's] automobile."
[3] The lower court found that the sheriff's counsel was neither involved in the copying of the videotape nor had knowledge of the fact that a shorter version of the videotape had been supplied to Bass. In fact, it appears from the record that Tramel's counsel also received a "short version" of the videotape from Sheriff Department employees.
[4] When a trial court imposes sanctions, its order, as here, should contain express written findings of the actions that support the sanctions. Commonwealth Federal Savings and Loan Ass'n v. Tubero, 569 So.2d 1271 (Fla.1990); Wright v. Allen, 611 So.2d 23 (Fla. 1st DCA 1992).
[5] Section 30.07 provides: "Sheriffs may appoint deputies is to act under them who shall have the same power as the sheriff appointing them, and for the neglect and default of whom in the execution of their office the sheriff shall be responsible."
[6] See, generally, Jamie S. Gorelick, Stephen Marzen & Lawrence Solum, Destruction of Evidence, § 2.2 (1989).
[7] It should be noted that a litigant's destruction or alteration of evidence harmful to that litigant may naturally give rise to an unfavorable inference against the litigant. As Judge Learned Hand observed: "When a party is once found to be fabricating or suppressing documents, the natural, indeed, the inevitable conclusion is that he has something to conceal, and is conscious of guilt." Warner Barnes & Co. v. Kokosai Kisen Kabushiki Kaisha, 102 F.2d 450, 453 (2d Cir.), modified, 103 F.2d 430 (2d Cir.1939).