# Third District Court of Appeal

## State of Florida

Opinion filed September 10, 2025.
Not final until disposition of timely filed motion for rehearing.

_____

Nos. 3D23-2085 & 3D24-0585
Lower Tribunal No. 15-29014-CA-01

_____


**Jana Maradona, etc., et al.,**
Appellants,

vs.

**Claudia Rosana Villafañe, et al.,**
Appellees.


Appeals from the Circuit Court for Miami-Dade County, Carlos Lopez and Spencer Eig, Judges.

EFR Law Firm, and Eduardo F. Rodriguez, for appellants.

MPA Law, and M. Paula Aguila and Monica Amador, for appellees.


Before EMAS, LOBREE and GOODEN, JJ.

EMAS, J.

**INTRODUCTION**

In 2015, Diego Maradona initiated an action in the trial court against his ex-wife Claudia Villafañe. In the operative complaint, Maradona alleged that Villafañe, both during and after their marriage, fraudulently concealed her purchases of several pieces of real property in Miami-Dade County, breaching her fiduciary duty to Maradona, and that Maradona was unaware of these actions by Villafañe when the parties executed their Marital Settlement Agreement in 2013. In 2020, Maradona passed away, and the lawsuit continued through the personal representatives of his estate.[1]

In these consolidated appeals, Maradona appeals 1) the trial court's final summary judgment in favor of Villafañe; 2) the trial court's order holding Maradona in indirect criminal contempt and imposing sanctions; and 3) final judgment awarding monetary sanctions (attorney's fees and costs) totaling $85,480.79.

For the reasons that follow, we affirm the final summary judgment in favor of Villafañe. However, we reverse the order holding Maradona in contempt and, because the order awarding monetary sanctions was the result (at least in part) of the order of indirect criminal contempt, we reverse

---

[1] For ease of reference, we refer collectively to appellants as "Maradona."

that order as well, and remand for further proceedings consistent with this opinion.

## FACTUAL AND PROCEDURAL BACKGROUND

Maradona and Villafañe were married in 1989 in Argentina. They had two children before they separated, and were eventually divorced in Argentina in 2003. The parties entered into the Marital Settlement Agreement ("MSA") in August 2013. According to the allegations of the complaint, Maradona's attorney performed an "audit of [his] finances" in 2014, and that is when Maradona first discovered that Villafañe had fraudulently purchased, between 1999 and 2008, several properties located in Miami-Dade County with Maradona's money.

Villafañe moved to dismiss the action for forum non conveniens, noting that Maradona had filed the same lawsuit in Argentina. The trial court denied the motion, and on appeal, this court affirmed the order denying the motion to dismiss for forum non conveniens. See Villafañe v. Maradona, 253 So. 3d 708 (Fla. 3d DCA 2018).

Thereafter, Maradona amended his complaint, asserting claims of unjust enrichment, breach of fiduciary duty, conversion, constructive fraud, constructive trust, and equitable accounting. Villafañe again moved to dismiss the complaint based on the "parallel proceeding" in Argentina, but

3

the motion was denied. Villafañe filed an answer and affirmative defenses, asserting, inter alia, that Maradona was aware of Villafañe's real estate purchases, and that Maradona's claims were all barred by the applicable statutes of limitation and by the terms of the MSA. She also asserted counterclaims for abuse of process, malicious prosecution, and defamation. These counterclaims were later dismissed by the court.

Villafañe later filed a motion for an order to show cause why Maradona should not be held in contempt, and sanctions imposed against him, based on the fact that, despite discovery requests and an order compelling production, Maradona had failed to produce the records, documents or other items related to the "audit of [his] finances" which he alleged uncovered the misconduct and led to the filing of this action. Maradona, in defense of his failure to produce documents, contended that the use of the word "audit" was inadvertent, that in fact no audit of his finances had been performed, and that his discovery of the alleged fraudulent misconduct by his former wife was the result of a paper review of records in Miami-Dade County.[2]

---

[2] Indeed, Maradona eventually admitted that "the audit that is referenced in . . . the Amended Complaint was performed by Matias Morla, Esq. All responsive documents obtained from the public records searches and relied on in the audit, as well as the reports obtained from Florida counsel have already been produced." Villafañe deposed Mr. Morla, who testified that he did conduct an audit of Maradona's finances, and that the report was located

Following a hearing, the trial court granted Villafañe's motion, found Maradona in contempt for violation of the trial court's order compelling the production of the audit of his finances, struck from the operative complaint any references to an "audit," and determined Villafañe was entitled to attorney's fees and costs. Maradona moved for reconsideration, which was denied.

Villafañe later moved for final summary judgment and, following a hearing, the trial court granted Villafañe's motion and entered final judgment in her favor on October 20, 2023. Thereafter, the trial court held a hearing on the amount of attorney's fees and costs to be awarded as a sanction for Maradona's conduct and the resulting contempt order. Following that

in Argentina, but Mardona's counsel later contradicted this testimony at a hearing, stating that Morla did not prepare a report.

In addition, after the court had ordered Maradona to correct an earlier response to request for production by reproducing the documents with Bates stamps for proper identification, and specifically identifying by Bates numbers those documents that comprised the audit of his finances, Maradona identified a total of 61 pages which had already been produced, but further explained that "Plaintiff's counsel accidentally deleted the totality of the documents that Plaintiff has produced to Defendants in this case and cannot rule [out] that additional documents that are responsive are not also responsive to this request."

Eventually, Maradona acknowledged that the "audit" was merely a review of online documents conducted in 2014, allegedly revealing purchases of Miami-Dade properties by Villafañe.

5

hearing, the trial court entered an order awarding $76,934.25 in attorneys' fees and $8,546.54 in costs, for a total sum of $85,480.79.

These consolidated appeals followed.

## DISCUSSION AND ANALYSIS

## The Final Summary Judgment

Maradona contends there are genuine issues of material fact which preclude summary judgment; the statutes of limitation did not bar his action because they were tolled by Villafañe's concealment of her fraudulent scheme; and Maradona's claims were not barred by the parties' MSA.

In its order granting final summary judgment, the trial court found in Villafañe's favor on all three of these bases. We review this issue de novo. See Fernandez v. Old Republic Nat'l Title Ins. Co., 406 So. 3d 299 (Fla. 3d DCA 2025) (noting we review orders granting summary judgment and pure legal issues de novo). We need address only the latter of the three issues, as it is dispositive and compels affirmance of the trial court's final summary judgment: The parties' MSA barred all the claims brought by Maradona in his operative complaint against Villafañe.

The claims against Villafañe in Maradona's lawsuit included: unjust enrichment, breach of fiduciary duty, conversion, constructive fraud, constructive trust, and equitable accounting. All these claims centered upon

6

Villafañe's alleged concealment of her "scheme" to defraud Maradona by purchasing several pieces of real estate in the name of several companies, using Maradona's money, without his knowledge or approval. These real estate purchases are alleged to have occurred between January 2000 and January 2009. The MSA was executed on August 8, 2013, more than four and one-half years after the last of the alleged purchases. Maradona claims to have discovered this fraudulent scheme in 2014 when he conducted an "audit of [his] finances."

In the 2013 MSA, Villafañe was granted a property in Argentina and Maradona acknowledged having given Villafañe certain loans in 2012, which were forgiven as a part of the terms of the Agreement. Importantly for our purposes, the parties agreed that the assets disclosed in the MSA:

> have been the only ones comprising the undivided assets of husband and wife, and that others that could have comprised it have been divested as a whole and their price received in halves. Moreover, they declare that they have been completely compensated between themselves with regard to the potential differences that might exist with regard to the assets allocated to each. Consequently, they expressly waive the right to make a claim with regard to the settlement and allotting the assets comprising the community property.

(Emphasis added).

Thus, in 2013, Maradona had expressly waived any right to make a claim that there were additional marital assets, and his belated 2014

7

"discovery" that there were other properties belonging to the couple is irrelevant. The fact that his "discovery" of this alleged fraudulent scheme was uncovered by what Maradona later acknowledged was a simple public online search is further evidence that he could have easily discovered such assets (all alleged to be Miami-Dade properties purchased by Villafañe between 2000 and 2009) long before Maradona signed the MSA in 2013. Because Maradona waived any right to claim the Miami-Dade properties allegedly purchased by Villafañe between 2000 and 2009 were marital property, the trial court properly granted summary judgment.

## The Contempt Order and Order Imposing Sanctions

"A trial court's contempt judgment 'comes to the appellate court clothed with a presumption of correctness' which should not 'be overturned unless a clear showing is made that the trial court either abused its discretion or departed so substantially from the essential requirements of law as to have committed fundamental error.'" Rojo v. Rojo, 84 So. 3d 1259, 1261 (Fla. 3d DCA 2012) (citation omitted).

Although, strictly speaking, a criminal contempt proceeding is not a criminal prosecution, it is nevertheless well-established that "a defendant subject to indirect criminal contempt proceedings is accorded a panoply of procedural and substantive due process safeguards . . . ." White v. Junior,

8

219 So. 3d 230, 232 (Fla. 3d DCA 2017). The trial court must strictly adhere to the requirements of Florida Rule of Criminal Procedure 3.840, the procedural rule governing indirect criminal contempt. See Bajcar v. Bacjar, 247 So. 3d 613 (Fla. 3d DCA 2018); Fla. R. Crim. P. 3.840(a)–(g) (providing, inter alia, that an indirect criminal contempt proceeding requires: the issuance of a written order to show cause stating the essential facts constituting the criminal contempt; the right to be represented by counsel; a reasonable time for preparation of a defense after service of the show cause order; an arraignment on the charge; an opportunity to seek a statement of particulars or file motions and an answer to the show cause order; a formal final hearing on the charge; the right to compulsory process for the attendance of witnesses at that hearing; and the right to testify in his or her own defense).

We need not belabor the point or further illustrate the rule's requirements, except to note, for example, that no written order to show cause was issued, stating the essential facts constituting the criminal contempt; no arraignment was held; no formal opportunity was provided to seek a statement of particulars or to file motions and an answer to the show cause order. And while it's true that Maradona was represented by counsel, it's unclear whether Maradona or his counsel were even aware that this

9

proceeding was for a criminal contempt (as opposed to civil contempt) given that nowhere in Villafañe's motion, or in the order "granting" the motion and holding Maradona in contempt, does it specify the civil or criminal nature of the contempt judgment. Had there been compliance with the procedural requirements of rule 3.840, surely all would have been on notice that the nature of the proceeding was a criminal contempt.

While the contempt order fails to expressly designate whether it is criminal or civil, direct or indirect, the order bears the hallmarks of an indirect criminal contempt. First, it is undisputed that the conduct at issue did not occur "in the actual presence of the court", see Fla. R. Crim. P. 3.830 ("A criminal contempt may be punished summarily only if the court saw or heard the conduct constituting the contempt committed in the actual presence of the court"), thereby making it an indirect contempt. See White, 219 So. 3d at 232.

Second, the order fails to contain a purge provision, a requisite for a civil contempt order. Sosa v. Portilla, 306 So. 3d 979, 980 (Fla. 3d DCA 2020) ("The purpose of civil contempt is to obtain compliance with a court order. For this reason, civil contempt requires a purge provision, whereby the sanction stops as soon as the party purges itself of contempt by complying with the order."); Carmenates v. Hernandez, 127 So. 3d 631, 633 (Fla. 3d

10

DCA 2013) ("A civil contempt order must contain a specific purge provision that adequately informs the contemnor what he or she must do to purge the contempt."). As we noted in Kaplan v. Schurr, 406 So. 3d 272, 278 (Fla. 3d DCA 2025), "[a] civil contempt is in the nature of a continuing violation (i.e., the continued refusal to comply with a court order) and a civil contempt proceeding is necessary to 'coerce' the contemnor into complying with the order. In this sense, the civil contemnor 'holds the keys' to the jail cell in his pocket, for he can 'purge' the contempt by his voluntary compliance with the court order.").

Finally, the language of the order at least implies the contempt is criminal, rather than civil, in nature, as it concludes that "the Court holds Plaintiff in Contempt **for violation of the September 26, 2019, Order**." (Emphasis added.) See Bacjar, 247 So. 3d at 616-17 (observing that "a civil contempt is intended not to 'punish' past conduct but to coerce future compliance while "criminal contempt is a sanction for past conduct, intended 'to vindicate the authority of a court and to punish the offending participant.'" (quoting Bowen v. Bowen, 471 So. 2d 1274, 1277 (Fla. 1985)) (additional citations omitted).

It is unavailing to simply rely upon Florida Rule of Civil Procedure 1.380 as a basis for imposing a judgment of criminal contempt as a sanction for the

11

violation of a discovery order. Rule 1.380 does not exempt such a proceeding from the rigorous demands of rule 3.840 before someone may be adjudged in indirect criminal contempt of court. Indeed, rule 1.380, and the broad authority to impose sanctions, was created primarily as a vehicle for ensuring compliance with discovery requests and discovery orders. See, e.g., Fla. R. Civ. P. 1.380(b)(1) ("Failure to Comply with Order. If, after being ordered to do so by the court, a deponent fails to be sworn or to answer a question or produce documents, the failure may be considered a contempt of the court."); see also Stokes v. Clark, 390 So. 2d 489, 491 (Fla. 1st DCA 1980) (holding that the purpose of the sanctions provisions in 1.380 is to "compel discovery and to penalize those parties improperly failing to comply with the discovery rules.").

In other words, the principal purpose for which contempt and other sanctions are authorized under rule 1.380 is civil—not criminal—in nature, focused on compelling parties to comply with the discovery process and with the trial court's discovery orders. As the Florida Supreme Court reminds us in Levin, Middlebrooks, Mabie, Thomas, Mayes & Mitchell, P.A. v. U.S. Fire Ins. Co., 639 So. 2d 606, 608-09 (Fla. 1994), "a trial judge has the inherent power to do those things necessary to enforce its orders, to conduct its business in a proper manner, and to protect the court from acts obstructing

12

the administration of justice." This includes "the ability to use its contempt powers to vindicate its authority and protect its integrity by imposing a compensatory fine as punishment for contempt." Id. at 609; see also Kane v. Sanders, 232 So. 3d 1107 (Fla. 3d DCA 2017).

Had the trial court rendered an order of civil contempt, or an order imposing alternative sanctions under rule 1.380, we might well have found such an order to be within the trial court's broad discretion upon the record before us. However, because the trial court did not find Maradona in civil contempt, but rather, in indirect criminal contempt, strict compliance with the procedural requirements of rule 3.840 was required before exercising such sanctioning power. Its failure to do so requires reversal.

## **CONCLUSION**

For the reasons stated above, we affirm the final summary judgment.

However, given that the trial court erred in holding Maradona in indirect criminal contempt and in imposing sanctions without strictly adhering to the procedural requirements of rule 3.840, we vacate the order holding Maradona in indirect criminal contempt and finding such conduct warranted the sanctions of striking certain language from the operative complaint and the awarding of attorney's fees and costs. Further, because these sanctions flowed directly from the finding of indirect criminal contempt, we also vacate

the final judgment awarding monetary sanctions (attorney's fees and costs) totaling $85,480.79.[3]

Affirmed in part, reversed in part, and remanded for further proceedings not inconsistent with this opinion.

---

[3] As indicated earlier, this opinion should not be interpreted as prohibiting the trial court, on remand, from imposing these sanctions for Maradona's conduct in the trial court.  See Malek v. Malek, 388 So. 3d 956, 958 (Fla. 3d DCA 2024) (noting that "a trial court has 'considerable latitude' to impose a sanction to address a party's abuse of the judicial process") (quoting Tramel v. Bass, 672 So. 2d 78, 82 (Fla. 1st DCA 1996)), and we offer no opinion on that question.  We hold simply that, because the trial court imposed sanctions as a result of an indirect criminal contempt order that failed to comply with the requirements of rule 3.840, and because we cannot discern from the record or from the sanctions order whether the trial court would have imposed the same sanctions absent the (now vacated) finding of criminal contempt, we must reverse both the contempt order and the final judgment imposing sanctions.