WELLS, Judge.
E.I. DuPont De Nemours appeals from an order striking its pleadings and entering a default judgment against it for a “fraud on the court” purportedly perpetrated by DuPont in its creation, use, and representations concerning its document depository and collection related to its product Benlate. DuPont also appeals from the subsequent final judgment awarding $223,135 in compensatory damages, $800,000 in punitive damages, and $414,590.41 in prejudgment interest.[1] Be *622 cause the record does not support the finding that DuPont made the misrepresentation on which the trial court based its ruling, and, equally determinative, because the record does not demonstrate any willful intent on DuPont’s part to mislead the trial court or opposing counsel, on the following analysis, we reverse.
The final judgment in this case derives from the claims of Mr. and Mrs. Sidran, the owners of a small hobby-turned-commercial orchid nursery located in their home’s backyard. See Sidran v. E.I. Dupont De Nemours & Co., Inc., 925 So.2d 1040 (Fla. 3d DCA 2003) (clarified on denial of rehearing Jan. 11, 2006, and remanded for new trial). According to the Si-drans, from sometime in 1988 through February 1991, they applied Benlate as a fungicide to treat their plants. In 1989, Mrs. Sidran began to notice changes in her orchid plants and after the couple received notice in May of 1991 that Benlate DF- was being recalled, she and her husband made a claim via a process established by DuPont to resolve Benlate-related complaints. When their demands were not resolved via this process, the Sidrans brought suit in August 1992, raising claims sounding in breach of implied warranty of merchantability and negligence. More specifically, the Sidrans alleged that the Benlate DF that they had purchased “was either contaminated with a foreign substance which was toxic to plants and/or was negligently designed or formulated when it was manufactured and sold by DUPONT so as to become toxic during its foreseeable use.”[2]
By the time this action was filed, DuPont already was dealing with hundreds of Benlate-related lawsuits and had begun to collect and preserve at a central location Benlate-related documents to facilitate ongoing and anticipated discovery. This collection of documents, initially known as the Benlate Document Depository and later the Benlate Document Collection, would quickly increase to encompass over 1.5 million pages and then — over time as discovery progressed in over 800 Benlate related cases — to more than 5 million pages. The Depository and then the Collection were used by DuPont’s lawyers to facilitate discovery and they were made available to opposing counsel for investigation and use as well.
In early 1995, this action was tried for the first time and resulted in a verdict in the Sidrans’ favor. That verdict was nullified because of the pervasive misconduct of the Sidrans’ attorney, Edwin Ratiner, during trial. This action was tried a second time in mid-2001 and resulted in a verdict for DuPont. That verdict was nullified on appeal due to an evidentiary error. See Sidran, 925 So.2d at 1043-44.
Following the second trial, the Sidrans’ representation was turned over to Robert Ratiner, Edwin Ratiner’s son. At this point the case veered off course from a negligence/products liability action to an action for fraud on the court based on a claim that DuPont’s Benlate Depository and Collection were shams, “created and manipulated by DuPont for the purpose of presenting an appearance of being responsive to Benlate discovery,” when in reality *623 it was not. After years of the Sidrans’ attorney advancing that position, this claim resulted in the order under review, dated January 19, 2011, which adopted that argument, and concluded that DuPont had perpetrated “an unconscionable scheme, calculated to interfere with the judicial system’s ability to impartially adjudicate Benlate matters by unfairly restricting plaintiffs’ ability to gather evidence to prove its claims.”[3]
DuPont’s pleadings were stricken and a default was entered against it for perpetrating fraud on the court. Following a trial on damages alone, final judgment was entered against it. We reverse the order finding a fraud on the court, striking the defendant’s pleadings and entering a default, because that order is unsupported by any evidence, much less clear and convincing evidence. See Bertrand v. Belhomme, 892 So.2d 1150, 1152-58 (Fla. 3d DCA 2005) (“An appellate court reviews a trial court’s imposition of sanctions under an abuse of discretion standard of review. Although the trial court has wide discretion in the imposition of sanctions, the court’s discretion is not unlimited. The standard required to support a finding of fraud upon the court is reasonably straightforward. The evidence to support a finding of fraud must be clear and convincing.”) (citations omitted). We also reverse the final judgment entered against DuPont the validity of which depends on the sanctions order.
Fraud on the Court
“Fraud on the court occurs where ‘it can be demonstrated, clearly and convincingly, that a party has sentiently set in motion some unconscionable scheme calculated to interfere with the judicial system’s ability impartially to adjudicate a matter by improperly influencing the trier of fact or unfairly hampering the presentation of the opposing party’s claim or defense.’ ” Robinson v. Weiland, 988 So.2d 1110, 1111 n. 1 (Fla. 5th DCA 2008) (quoting Cox v. Burke, 706 So.2d 43, 46 (Fla. 5th DCA 1998)); see Wenwei Sun v. Aviles, 53 So.3d 1075, 1077 (Fla. 5th DCA 2010) (accord). While “a trial court has the inherent power to impose sanctions on a party who destroys evidence or perpetrates a fraud on the court,” that power should be exercised with great restraint because the courts of this state favor adjudications on the merits. Babe Elias Builders, Inc. v. Pernick, 765 So.2d 119, 120 (Fla. 3d DCA 2000); Tramel v. Bass, 672 So.2d 78, 83 (Fla. 1st DCA 1996) (accord); see also Rocka Fuerta Constr. Inc. v. Southwick, Inc., 103 So.3d 1022, 1024 (Fla. 5th DCA 2012) (“[T]he inherent authority to dismiss actions based on fraud ... should be used ‘cautiously and sparingly,’ and only upon the most blatant showing of fraud, pretense, collusion, or other similar wrong doing.” (quoting Granados v. Zehr, 979 So.2d 1155, 1157 (Fla. 5th DCA 2008))); Gautreaux v. Maya, 112 So.3d 146, 149 (Fla. 5th DCA 2013) (“When reviewing a case for fraud, the court should consider the proper mix of factors and carefully balance a policy favoring adjudication on the merits with competing policies to maintain the integrity of the judicial system.” (quoting Cox v. Burke, 706 So.2d 43, 46 (Fla. 5th DCA 1998))); Wenwei, 53 So.3d at 1077 (accord).
*624 Although a finding of fraud on the court generally has been premised on a proven outright lie on a critical issue,[4] or the destruction of determinative evidence,[5] whatever “scheme” of fraud a court finds must be supported by clear and convincing evidence that goes to “the very core issue at trial”:
To support a dismissal the court must find the “false testimony was directly related to the central issue in the case.” Morgan v. Campbell, 816 So.2d 251, 253 (Fla. 2d DCA 2002); see also Ramey v. Haverty Furniture Cos., 993 So.2d 1014, 1019 (Fla. 2d DCA 2008). It is the moving party’s burden to establish by clear and convincing evidence that the non-moving party has engaged in fraudulent conduct warranting dismissal. Cross v. Pumpco, Inc., 910 So.2d 324, 327 (Fla. 4th DCA 2005).
Gilbert v. Eckerd Corp. of Fla., Inc., 34 So.3d 773, 775-76 (Fla. 4th DCA 2010).
The Sidrans’ Claim of Fraud on the Court
In the instant case, neither an outright lie nor the destruction of vital evidence was the basis of the trial court’s ruling. To be clear, here, there is no “smoking gun.” That is, the Sidrans do not claim that DuPont failed to produce a single document that was necessary for them to prove their claims or that they are aware that such a document might exist. And, no employee has testified that critical documents were purposely destroyed, that instructions had been given to eliminate determinative materials, or that DuPont had instructed anyone to create its initial document Depository, or later Collection, as a sham.[6] In fact, the unrefuted testimony *625 was that DuPont instructed employees to send everything Benlate related to be gathered first in one central physical location and later, in the company’s computerized Collection. (Plaintiffs ultimately complained about that too — suggesting the company was purposely creating a “haystack” for the express purpose of making it difficult for them to find what they needed. Although again, there was no proof of that assertion either.). Rather, the court below concluded that notwithstanding the thousands of documents actually produced and made available to the Sidrans and the court over a period of almost twénty years, a fraud had been perpetrated because DuPont had purportedly represented that its Benlate Depository and Collection were “complete” and “reliable”[7] while, in fact, they were not.
The Litigation Fails To Prove a Misleading Assertion, Let Alone a Willful Misleading Assertion
A careful review of the evidence demonstrates that DuPont never represented to the Sidrans that its document Depository and Collection were complete collections and could be relied on as such. DuPont always represented that its collections were not “complete” compilations but rather works in progress, compiled from the voluntary submissions of its employees world-wide and from discovery conducted in over 800 Benlate-related cases. The evidence on this issue is uncontested. According to Sharon Chew-Woodhouse, the legal assistant charged in 1992 with collecting, organizing and managing DuPont’s Benlate-related documents, when she was employed in 1992, DuPont’s legal department had just begun gathering Benlate-related documents. Shortly after she joined DuPont, massive amounts of discovery began to be propounded in Benlate-related cases. In response to these demands, letters were sent to all senior managers world-wide asking that they provide all Benlate-related documents, no matter the format, to the legal department. Documents thereafter poured in.
As documents arrived, they were processed by fifty to one hundred individuals, many employed by a large number of non-DuPont entities, operating three shifts per day.[8] These mostly manual workers copied the originals received from DuPont scientists, departments, laboratories, and offices and Bates-stamped the copies. Originals were returned to their source; stamped copies were reviewed to determine whether they contained confidential or privileged information. Privileged documents were segregated into a privilege library and logged; non-privileged documents were retained for use in discovery in what was called the Depository. By mid-1992, the number of pages of Benlate-related documents collected by the legal department had grown from 250,000 to 1.5 million.
Without experience in the management of so many documents and with no avail *626 able technology at that time, DuPont decided that the only way to organize these documents for use in discovery was by the source from which they had come. The documents in the Depository were indexed using a subject-level index, rather than a document-level index,[9] indicating a range of Bates-stamped pages in which documents about a given or listed source or subject might be located. As documents were collected and added to the Depository over the years, they were organized and indexed in this manner until 1999 when the contents of the Depository were scanned into the Virtual Partner computer program known as the Collection.
As Chew-Woodhouse’s testimony confirms, DuPont’s document collections are and always have been a continual work in progress and while DuPont has attempted to collect all information relating to Ben-late, it has never been in a position to represent that its collections are “complete” containing every single document that could possibly exist relating to Ben-late. Nor has it done so in this case.
As early as December of 1992, when DuPont responded to the Sidrans’ first set of interrogatories it advised that it would produce responsive documents to the extent it had collected them:
[Sidran Interrogatory] 9. Identify each and every subcontractor which the Defendant used or employed in the manufacturing process of the Benlate, identify the date such subcontractor was used or employed by the Defendant and describe the exact part of the manufacturing process for which each subcontractor was responsible during the exact stages of the production process in which such subcontractor participated.
RESPONSE TO INTERROGATORY NO. 9: ... Subject to and without waiver of ... objections DuPont states that from 1970-1987 and 1991-present, Ben-late WP was formulated at DuPont’s plant located in Belle, West Virginia. Benlate 50 DF was formulated by the following independent formulators:
a. Bold Chemical Company located in Tifton, Georgia during the summer of 1986;
b. Terra International at Blytheville, Arkansas from the summer of 1987 to August, 1990; and
c. Platte Chemical Company, Fremont, Nebraska from 1987 through March, 1991.

Pursuant to Florida Rules of Civil Procedure, DuPont will produce for inspection, under an appropriate protective order, non-privileged documents, currently collected, which contain the identifying information sought in this interrogatory. To the extent DuPont has collected responsive documents they will be produced to plaintiff for inspection at DuPont’s document depository located in Wilmington, Delaware.

(Emphasis added).
In February of 1995, it provided the Sidrans with a copy of its guidelines for directly accessing the Benlate Depository (that is, going to the Depository and looking through everything in it). Those guidelines, in addition to detailing the rules regarding access to the Depository, described the Depository — which by then comprised 4.3 million pages — as the result of its on-going efforts to collect and organize its own documents generated over a *627 twenty-five-year period related to the development, testing, manufacturing, and marketing of Benlate as well as those documents being produced by it and by others in various Benlate-related lawsuits:
The documents located in the Ben-late® Document Depository were collected from various sources both within and outside DuPont. The collection process included not only DuPont documents, but any and all documents in the possession of the responding source pertaining to the subject of the request. DuPont’s document collection and processing are on-going with respect to newly identified or requested documents. If additional documents are collected and processed for production they will be indexed and made available for inspection at this depository.
The document collection effort has been directed towards the identification and processing of documents generated over the approximately 25-year period of research, development, testing, and manufacturing and marketing of Ben-late® and related chemicals.
At no point did DuPont represent that no other documents existed or might exist other than those it had collected.
In August 1995, after the first trial of this matter, the Sidrans propounded at least eight additional requests for production asking DuPont to provide thousands of documents. These requests were accompanied by interrogatories requesting information about each of the documents requested as well as requests for admissions asking DuPont to admit, at a minimum, the authenticity and admissibility of those thousands of documents.
In their Fourth Request for Admissions, the Sidrans asked DuPont to admit, among other things, that: (1) the Depository was prepared and maintained as part of DuPont’s regularly conducted business; (2) the Depository was a “complete” compilation of “all documents” generated over the twenty-five-year period during which Ben-late was being developed, manufactured, and marketed; and, (3) that the Depository “contained]” a description of “all” of the documents created since June of 1992.
DuPont unequivocally denied that the Master Index to its Benlate document Depository was “a complete index” of “all” documents generated over the twenty-five-year period during which Benlate was developed and that this index contained a description of “all” documents created since June 1992 and all science related documents created since December 1992. Instead, it admitted only that the Depository was comprised of documents which its representatives had attempted to and had successfully collected:
REQUEST NO. 8: Admit that the attached Master Index to Benlate Document Depository is a complete index containing all documents generated over the approximately 25-year period of research, development, testing, manufacturing, and marketing of Benlate and related chemicals.
RESPONSE: ... Subject to and without waiving its objections, DuPont denies this request and refers Plaintiffs to DuPont’s response to Request No. 1. DuPont admits only that representatives of DuPont attempted to collect and/or locate documents related to Be-nomyl and Benlate® maintained in the files of DuPont employees and others, and that copies of these documents have been made available for inspection and copying by Plaintiffs at DuPont’s document depository in Wilmington, Delaware.
REQUEST NO. 9: Admit that the attached Master Index to Benlate Document Depository contains a description of all of the general documents created *628 since June 1992 and all of the science related documents created since December 1992.
RESPONSE: ... Plaintiffs have also referred to an index which is no longer current.... DuPont admits only that representatives of DuPont attempted to collect and/or locate documents related to Benomyl and Benlate® maintained in the files of DuPont employees and others, and that copies of these documents have been made available for inspection and copying by Plaintiffs at DuPont’s document depository in Wilmington, Delaware.
(Emphasis added).
The following year, on February 7, 1997, the parties appeared for a pre-trial status conference. At that time, the Sidrans— who by then had propounded requests for literally thousands of documents — represented that discovery had been completed except for a review of approximately twenty documents that DuPont claimed to be privileged:
MR. E. RATINER [Plaintiffs’ Counsel]: Your Honor, on behalf of the plaintiff I can represent that all discovery has been completed. The only matter that is presently before the master is the request for the provision by the defendant of a specific privilege log to enable either Your Honor ... to rule on the defendant’s claim of privilege as to certain of the DuPont documents ....
[[Image here]]
... Your Honor, when would you like to have review of the defendant’s privilege log? There are approximately I think 20 or 30 items that they’ve raised
[[Image here]]
(Emphasis added).
This representation was patently untrue. The Sidrans continued to demand production of documents, until this case was tried a second time in June of 2001 resulting in a judgment in DuPont’s favor. In the meantime, in 1999, DuPont converted its paper document Depository into an electronic format called the document “Collection” or “BEND” (the Benlate Document Collection).
By the time the second final judgment was reversed in 2006, the record in this case, excluding any trial transcripts, comprised over 15,000 pages. Millions of pages of Benlate-related documents already had been made available to the Si-drans by DuPont for review; thousands of Benlate-related documents had been provided to the Sidrans by DuPont; a multitude of depositions had been taken; hundreds, if not thousands, of interrogatories and admissions had been answered by DuPont; and the Sidrans already had tried their two count negligence/products liability case to final judgment two times.
The Focus of the Litigation Shifts
Rather than resetting this matter for a retrial as ordered by this court, the Si-drans were allowed to entirely change the focus of this matter. This time the core of this case, by then fourteen-years old, changed from an action to determine whether DuPont had been negligent in the formulation, manufacture and distribution of Benlate and had distributed a contaminated product, to a claim that DuPont’s 4 million-plus page document Depository was designed and maintained to prevent litigants such as the Sidrans from adjudicating their claims on the merits, thereby working a fraud upon the court.
Discovery began again, this time concentrated on the company’s document collection. On November 9, 2006, the Si-drans’ “new attorney,” Robert J. Ratiner, set the deposition of DuPont’s records custodian “with most knowledge regarding the Benlate Document Collection” and requested that this witness produce “[a]ll *629 documents related to Benlate in DuPont’s possession, custody or control, which were neither produced to Ratiner & Lagos, P.A. on November 24, 2004,[10] nor identified on the privilege log dated June 18, 2004,” and “[a]ll searchable indices available to locate documents within DuPont’s Benlate Document Collection.” This same attorney, also counsel in five other Benlate-related cases against DuPont — Crew Farms, Bo-rek, Strano, Native Hammock, and Fuzzell v. DuPont — Sled similar, if not identical, notices in each of those cases seeking to obtain information about the creation, accumulation, organization, maintenance, management, indexing, and retrieval of documents from the Depository. DuPont objected, claiming not only that this request was overly burdensome but also that no basis for the request existed because it had not been sanctioned for failing to provide requested discovery and because this request would neither provide nor lead to production of any relevant evidence.[11]
*630 On March 29, 2007, DuPont was ordered to provide the court with an approximation of how many documents “related to Benlate” existed but had not yet been provided to counsel for the Sidrans. On May 8, 2007, DuPont filed a written compliance statement with the court. This compliance statement did three things. First, it described generally what comprised the Benlate Document Depository and the newer electronic Collection of documents and noted that, from time to time, documents inadvertently not included or newly identified as being Benlate-related were added to these collections:
In summary, the Benlate Collection is a group of documents originally kept in paper, hard-copy form in a physical location known as the Benlate Depository along with other material (video and audio tapes, photographs, oversized documents, computer data, etc.) defined as documents. Plaintiffs’ lawyers, DuPont lawyers and other accessed these materials at the Benlate Depository. When the physical location of the Benlate Depository was closed (this process began in late 1999), most of the documents were electronically copied and all the documents were moved to other locations. The majority were warehoused. Most of the documents formerly kept at the Benlate Depository are now preserved in electronic form as well as in hard copy. Some exist only in hard copy (see below). The paper documents which now also exist in electronic form are known, in the electronic form, as the Benlate Document Collection. Generally, these documents and certain other documents which are generally related to litigation issues arising from Benlate. Because of the nature of litigation, from time to time, documents not previously included in the Benlate Document Collection are identified as related to a particular Benlate issue and are added to the Collection. Likewise, sometimes documents that were missed previously are discovered and added to the Collection. The Collection contains documents relating to all types of Benlate issues and allegations. For example, the Collection contains documents which relate to human health effects allegations and to shrimp farm allegations [aquaculture].
(Footnotes omitted).
Second, it described what DuPont had already provided to counsel for the Si-drans:
On November 24, 2004, DuPont, voluntarily and without charge, provided Ratiner & Lagos with 70 DVDs containing tif images of the documents contained in the collection of documents known as the Benlate Collection and documents related to the Gutter Shareholder Litigation. The Benlate Collection DVDs contain approximately 3,897,-702 pages of documents in tif format. DuPont also provided a computer searchable index to the Benlate Collection. The Gutter Shareholder Litigation DVDs contain a separate collection of documents consisting of approximately 602,158 pages. The current duces te-cum request arises solely from these DVDs voluntarily supplied by DuPont.
DuPont also advised the court that it had provided counsel for the Sidrans with a privilege log for the Benlate Collection comprised of 2989 pages; a privilege log *631 for the Crawford Claim Files[12] comprised of 818 pages; and a Gutter privilege log[13] comprised of 3410 pages.
Third, DuPont described what it had not provided to counsel for the Sidrans which consisted of: (1) “about” 1.5 million pages from the Crawford Claim File; (2) 1,531 computerized data tapes comprising the electronic media documents; (3) 37,967 photographs and approximately 300 oversized documents; (4) 205 video and 171 audio tapes; and (5) well over a million pages of court and deposition transcripts, pleadings and documents related to Ben-late cases past and ongoing. DuPont also disclosed that numerous individuals at DuPont had saved various non-DuPont documents (news articles, publications, etc.) related to Benlate after litigation began, but that these documents had not been cataloged and it was “impossible to say how many exist[ed] in DuPont’s possession without undertaking a burdensome collection and indexing process and that these had not been provided.” DuPont also advised that it had not provided closed Ben-late case files from DuPont’s outside counsel which, in addition to pleadings and lawsuit-related papers, contained “work product writings” and “attorney-client protected communications.” Lastly, DuPont advised that there were a significant number of documents “consisting of communications among DuPont’s attorneys and from DuPont lawyers to other DuPont employees as well as memoranda, notes and other documents created by lawyers or legal personnel regarding litigation strategies, opinions, thoughts and mental impressions, and other privileged matters” which had not been provided.
DuPont also advised the court below that although it believed that this list of items provided and not provided to the Sidrans was complete, because of the nature of the request involved, it was possible that some documents or categories of documents might have been missed:
We believe this list is complete, but because of the nature of the request, it is possible that a document or a category of documents was missed. The marketing of Benlate has ceased, but litigation remains active. This litigation and activities related to it may cause the receipt or creation of a document by DuPont which is not relevant to this case but is related to Benlate. Such an event could occur at any level of the company at any time. Again, it is unreasonable and burdensome to require DuPont to attempt to identify all documents “related to Benlate” when those documents have no relevance to Plaintiffs’ case.
On May 16, 2007, the Sidrans took the deposition of Deborah Naylor, the person designated by DuPont as having the greatest knowledge of its document Collection. Following that deposition, DuPont moved for a protective order stemming from the inappropriate behavior of the Sidrans’ attorney, Robert J. Ratiner, during Ms. Naylor’s deposition. The Sidrans responded, characterizing DuPont’s discovery responses as “deceitful and fraudulent” and demanding all statements and transcripts of sworn statements of Daniel Maloney, Esq., Thomas Sherouse, Esq., and Sergio Pagliery, Esq.[14] relating to the organiza *632 tion or completeness of DuPont’s Benlate document Depository.
The September 14, 2007 Post-Naylor Motions for Sanctions
On September 14, 2007, the Sidrans, as well as the plaintiffs in the Native Hammock Nursery, Borek, Crew Farm, and Strano cases, filed a joint motion for sanctions against DuPont “FOR ITS CREATION OF A SHAM DEPOSITORY FOR THE APPEARANCE OF BEING RESPONSIVE IN DISCOVERY.” That forty-two page motion, reduced to its essence, alleged that the Benlate document Depository was represented to Plaintiffs’ lawyers as being a collection of all Benlate-related documents in DuPont’s possession, custody and control on which Plaintiffs’ lawyers should rely, while in reality the Depository was nothing more than an incomplete collection of Benlate-related documents favorable to DuPont. These allegations, while purportedly supported by selected excerpts from the deposition of Deborah Naylor, in reality were unsupported by that deposition.
Rather, Naylor’s deposition testimony confirmed only that which was represented to the Sidrans’ counsel in writing as early as 1992 and repeated a number of times over the then fourteen-year history of this case. That is, that the Depository was a collection of documents submitted by DuPont employees pursuant to a request that they provide all Benlate-related documents to the Depository, as well as documents secured by DuPont during hundreds of Benlate cases; that following legal review, some of the documents submitted were not included in the Depository; and that over time, some documents either intentionally or inadvertently may have been removed. Most significantly, the deposition excerpts do not establish that DuPont represented its document Depository or Collection as being “complete”:
Q [BY SIDRANS’ COUNSEL], Ma’am, if Dupont is going to hold out its depository, this collection of documents relating to Benlate as the source of all documents in its possession, custody and control relating to Benlate, isn’t the fact that all of these procedural failures and inadequacies clearly indicate that that’s not really even close to true.
That this depository, that these collections that have been represented and presented and represented to the plaintiffs and their lawyers as all of the documents in Dupont’s possession custody and control just are not even close to that?
They are not complete. There’s documents missing. There’s holes in gaps of thousands and thousands of pages?
MR. SHEROUSE [COUNSEL FOR DUPONT]: Objection to form.
THE WITNESS: No, that is not true.
Q. You are saying that this document depository, that these documents collections that Dupont makes available to the plaintiffs relating to Benlate, their accuracy is dependable and reliable; is that your testimony today under oath?
A. What I’m saying is that [the] depository is the same set of paper that the legal team uses as the visitors.
So, it is as complete as it is for anyone who wants to look at the Benlate collection.
Q. Ma’am, do you understand that doesn’t make it dependable or reliable. You put a bunch of documents in there and you say our legal team relies on it. Of course, because you kept the bad documents out.
MR. SHEROUSE: Object to form.
Q. Do you understand that that could occur under this example that you are using? Hey, our legal team relies upon it, therefore it must be complete.
*633 Well I’m sure every document that could possibly be found that helps Du-pont’s case, that helps Dupont’s arguments, I’m sure every one of them is in that depository.
My question is, is every document including the documents that don’t help Dupont including the documents that sink Dupont. Are those documents— can I rely and depend that those documents are in the depository as well?
MR. SHEROUSE: Objection to form.
THE WITNESS: The document depository is every document that was collected that is non-privileged and made available for the Benlate collection.
That is what I’m here to speak to. That’s what I know.
The same day the motion for sanctions for the purported creation of a sham depository was filed, the same five parties filed the following additional motions in each of their cases:
• motion to sanction DuPont and its attorneys for “FRAUD BASED UPON DUPONT’S SHAM DEPOSITORY” with attached copy of the Broward County/shrimp farmers sanction order;
• “MOTION FOR SANCTIONS: DUPONT’S BREACH OF PROMISE TO PRODUCE ‘EVERY CONCEIVABLE’ DOCUMENT RELATING TO BENLATE IN DUPONT’S POSSESSION, CUSTODY AND CONTROL AT DUPONT’S EXPENSE” claiming that three years earlier, in 2004, in another case pending in Leesburg, Florida (Fuzzell v. E.I. Dupont de Nemours, Case No. 97-739), counsel for DuPont had agreed “to produce every conceivable document relating to Benlate in its possession, custody and control which are responsive to Plaintiffs’ discovery propounded from November 24, 2007 forward”[15];
• “MOTION FOR SANCTIONS: DUPONT’S ‘SEARCHABLE INDEX’ PRODUCED TO PLAINTIFFS IS INCOMPLETE AND INTENTIONALLY MANIPULATED TO DECEIVE AND MISLEAD PLAINTIFFS’ AND OBSTRUCT PLAINTIFFS’ DISCOVERY OF EVIDENCE”; and
• “MOTION TO COMPEL DUPONT TO RESPOND TO PLAINTIFFS’ SUPPLEMENTAL REQUESTS FOR PRODUCTION DATED APRIL 5, 2007, PARAGRAPH 7, ONLY, AND FOR SANCTIONS.”
On November 7, 2007, DuPont was ordered to provide the Sidrans with: (1) a hard copy of the Master Depository Index; (2) a hard copy of the searchable indi-ces/fields for the Benlate document Collec *634 tion; and (3) instructions on how to use the searchable indices/fields to search for Benlate documents in the Collection.
DuPont’s November 2007 Compliance Response
On November 22, 2007, DuPont complied with the trial court’s order, providing the Benlate Master Depository Index and all of its supplements. The company explained that documents in that depository were identified by Bates numbers encompassing a range of numbers and not by document name or title. DuPont further explained that the index had been provided to those who visited the Benlate Document Depository in Wilmington, Delaware (this included one of the Sidrans’ attorneys in this case) and that the index could be used to locate documents generally described as coming within specified Bates numbered ranges.
As was explained to counsel for the Si-drans early on, the Bates numbers consisted of ten characters beginning with three letters (an alpha prefix) followed by seven numbers. For example, “BAT” identified an entry as a Neníate Audio Tape, while “BPM” identified an entry as coming from Neníate Price Mill. A copy of the alpha prefix codes was provided to the counsel for the Sidrans. As for the seven numbers following the prefix code, DuPont explained that the first three digits identified the source of the documents while the last four numbers identified the page numbers at which they appeared in the index. Thus, as DuPont explained, while the index could not be used to pinpoint a specific document, it could be used to review a range of documents in which a document might appear.
With regard to the order that it provide searchable indices for the Collection and its obligation to provide instructions on how to use it, DuPont advised that after documents from the depository were scanned into the Collection, they were organized into categories which could be reviewed by using a number of “searchable fields” that were provided by its litigation software, Virtual Partner. DuPont also provided a list of the forty-eight searcha-ble fields utilized for all non-privileged documents. These “fields” allowed searches for documents by name of the addressee; author of the document; title of the document; date of the document; range (DocID) of pages where the document might be found; names of those who received copies; person or organization mentioned in the document; where a document was missing; the production history of the document; whether a document was privileged; the type of document; identity of the person coding the document; science reference number of documents for lab books, notebooks, and research; source of document; document origination; chemical involved in the document; grower involved in a document; state involved in a document; and by many other fields as well.
In making this disclosure, DuPont advised that not all fields had been consistently coded or maintained and, thus, it did not rely on every field to conduct its own searches, but that it had found the addressee, author, title, date, and DocID fields (the “bibliographic fields”) the most useful for searching for documents in the Collection. It advised the court that in November 2004, it had provided the Si-drans’ counsel with 70 DVDs which comprised not just these bibliographic fields but the imaged documents that they indexed as well.
As for how to access the indices, DuPont advised that it used Virtual Partner litigation software which was licensed by Dati-con, Inc. and that it followed the instructions detailed in Chapter II of the Virtual Partner Users’ Manual to search the Vir *635 tual Partner database. DuPont also attached Chapters II and III of that manual to its response but refused to provide a copy of the Virtual Partner software because intellectual property laws precluded it from doing so.
The Trial Court Orders Additional Compliance Efforts by DuPont
Three weeks after this November 2007 compliance was filed, counsel for the Si-drans filed a ten page motion for sanctions complaining about this compliance attempt. On December 14, 2007, the court below addressed the sufficiency of DuPont’s November 7th compliance. While DuPont’s November 7th compliance response stated, as previously ordered, exactly how the computer program it used to keep track of its documents was organized and indexed, the court below demanded that DuPont provide the court with the proprietary software that DuPont used and concluded that DuPont was in contempt for failing to provide it with an index in keeping with the court’s instruction [16]:
THE COURT: ... Well, you know something, this is just an index of words and phrases that might be in a document. That isn’t what I meant. I wanted an index of every document you had. That’s not what you produced to me. That alone is contempt.... I want the documents four weeks from today.... And I want whatever equipment it takes to search it and I want a detailed explanation ....
[[Image here]]
MR. PAGLIERY: Let me clarify one thing, Judge, because we search using software called Virtual Partner from Da-tacon [sic]. We don’t own that.
THE COURT: I don’t care what you call it. That’s what I just said to you. I don’t care what you call it. I want to be able to go into the DuPont documents and find each and every document that DuPont has since [,] you told me that all these documents don’t really exist in paper form anymore, they exist in some sort of virtual form. I want to be able to get any single document that I want.
While no demand was pending for access to DuPont’s privileged-document databases, the court below also demanded access to those databases.
Within days, DuPont advised the court below that to comply with its request, DuPont would provide the court with a laptop computer pre-loaded with the requisite software as well as a secure ID and password. DuPont also advised the court that the system could not be operated on a wireless internet connection but had to operate on a wired internet connection.
DuPont Attempts To Assist the Court in Accessing the Virtual Partner Database
On January 11, 2008, DuPont appeared before the court and confirmed that the Collection’s indexing and search systems, which were used by all its in-house and out-of-house counsel to search for documents, had been established not by it, or any of its employees, but by Daticon, Inc., the entity whose litigation support software DuPont was using to keep track of *636 its documents. The attorney from DuPont’s local law firm who regularly accessed documents for the defense also appeared before the court at that time and offered to assist the trial court in logging into the program and in searching the databases to locate documents. The firm’s computer technician also appeared that day to address any technology problems the court might incur:
THE COURT: ... Did the lawyers create this or did a software technical person create it?
MR. SHEROUSE: Neither ... that was created by a company called Data-con [sic], Inc.... It was created by a company. I didn’t think the lawyers got together and created software.... For this litigation and all of the litigation that you’ve heard about, at the time when this got set up ... sometime in 1999, 2000, that period.
[[Image here]]
So the person who is the most familiar at our firm with this — if you wanted to have all of my knowledge of this ... who uses this the most and is most familiar with it ... is Ms. Rasile. She does searches, she uses it. And you will have [her to assist you].
[[Image here]]
... Mario Lao, who is here, is familiar with the connections ... [i]f you get dropped and somebody is having trouble with the various passwords to get back in ... [Mr. Lao can deal with that].
Now with direct access to DuPont’s internal computer program, the court asked the Sidrans’ counsel to provide the court with what he believed was a good example of the problems he was having with DuPont’s purported failure to provide documents so that the court could attempt to find these documents on its own. The court then invited the Sidrans’ counsel to engage with the court in an ex parte investigation through DuPont’s databases to locate these documents. DuPont objected. The trial court ignored DuPont’s objection and conducted an ex parte investigation with the Sidrans’ counsel.
At this juncture, the Sidrans claimed that DuPont had manipulated its document Collection by hiding documents in its privileged document database claiming:
■ It has been clearly established by DuPont’s own documents and conduct that Dupont wrongly believes privilege applies to evidence it “would like to keep from the other side.” Having concealed this evidence in response to these Plaintiffs’ discovery for the past 15 years, Dupont is now desperately trying to hide these extensive sources of evidence from this Court behind a stonewall to prevent disclosure of this massive coverup. Additionally, the searchable fields Dupont now claims are privileged likely will reveal the extremely efficient means by which Dupont has repeatedly demonstrated that is it able to access-identify and locate-documents which it needs for its own defense, which simply cannot be accomplished using those non-privileged field[s] identified to date.
The Sidrans Seek Yet More Discovery
In the meantime, on March 7, 2008, the Sidrans propounded yet another request for production in this now-sixteen-year-old case, asking for “all documents” describing, identifying or referring to the organization of biological researchers employed by DuPont “at all times” from January 1, 1965 to December 31, 1985; “all documents” identifying each biological researcher in the Ag Products/CR&D divisions of DuPont from January 1, 1965 through December 31, 1985; “all documents” identifying the research groups to which each biological researcher in the Ag Products/CR&D divisions were assigned *637 from January 1, 1965 through December 31, 1985; “all documents” describing the assignment of responsibilities to any researcher assigned to the Ag Products/CR&D divisions from January 1,1965 through December 31, 1985; “all documents” identifying any scientists in the Ag Products/CR&D organizations from 1988 to 1993; “all documents referring to work performed by or responsibilities assigned to any scientists in the Ag Products/CR&D organizations from 1988 to 1993”; and “all documents” referring to the' Greiling Farms recrop claim.
This request was accompanied by a set of interrogatories asking for hundreds of answers for information about those persons identified in the documents requested. DuPont objected to these requests claiming them to be over-burdensome in that it currently had 60,000 employees world-wide and had employed over 150,000 in the past, in countries around the globe. The Sidrans moved to compel.
In May of 2008, counsel for the Sidrans moved for a stay of at least eight weeks to address a medical issue. In February 2009, the Sidrans filed a list of forty items that they wanted the court below to consider in connection with their discovery and sanction motions. This list was comprised of two letters between DuPont and the Sidrans’ counsel dated September 19, 2007; discovery taken in five unrelated Benlate actions; and thirty three individually Bates-stamped documents.
DuPont Finally Rebels Against the Sidrans’ Unending Discovery Requests and Misrepresentations
Finally, in February of 2009, DuPont attempted to take the Sidrans to task for the many misrepresentations made by their attorney. In doing so, DuPont first reminded the court below that the Sidrans had repeatedly represented that discovery was virtually complete and that they were ready for trial, only to then assert a reason for postponing trial. By way of example, only two years before, on September 14, 2007, the Sidrans secured a postponement claiming that DuPont had purportedly failed to produce or identify a sixty-page report titled “Benlate/Benomyl Characterization” which their counsel described as a “major, major, major” bombshell that had to be explored. In reality, that document already had been provided to the Sidrans a number of times (on. at least four occasions) and turned out to be of little import.
DuPont also advised the court that the Sidrans had misrepresented to the court that there were 75,000 pages marked “non-responsive” in the Benlate Collection, when in fact these documents were located in a different collection related to a securities fraud case.[17] DuPont also asserted that the Sidrans’ counsel had falsely told the court that he did not have documents created outside the country relating to the compound flusilazole, because in July of 2007, DuPont had provided him with over 13,400 pages of flusilazole documents that had been created outside the United States. DuPont further advised the court that the Sidrans’ counsel had failed to inform the trial court that he had received these same documents in 1997 in response to discovery requests in two other Benlate cases, Fuzzell v. DuPont and Strano v. DuPont, in which he served as counsel. DuPont also pointed out that the Sidrans’ counsel had misrepresented to the court that DuPont was hiding evidence of Phyto-toxicity Inquiry Reports (PIRs), when in *638 fact these reports had been requested and provided in the Strano case and that counsel had misrepresented that he had never received a Crawford and Company privilege log, when in fact it had been provided in 1998 and again in 2000.
DuPont’s Motion For Protection is Granted and the Bar Sanctions the Sidrans’ Counsel
As was his practice, the Sidrans’ counsel attempted to level the accusational field and on August 12, 2009, sought sanctions against DuPont’s counsel. This motion claimed that DuPont’s counsel had committed fraud on the trial court when, in July of 2007, it filed a motion for protective order claiming that the Sidrans’ counsel had brandished a gun during settlement negotiations in an unrelated case and commented to a lawyer that “as a Jew you must know what it’s like to have a gun pointed at you.”
The motion for protective order about which the Sidrans complained was preceded by an earlier motion stemming from the wholly inappropriate behavior of the Si-drans’ counsel, Robert Ratiner, during the deposition of Deborah Naylor, DuPont’s records custodian — the witness on which the Sidrans’ “sham depository” claim initially depended.
That first motion complained about Ra-tiner’s abusive and aggressive behavior before, during and after Ms. Naylor’s deposition. Specifically, DuPont complained that before the deposition began, Ratiner called DuPont’s lawyer, Thomas Sherouse, “Nazi boy,” and commented that he [Ratiner] looked “down on people who live under rocks,” and “wish[ed counsel for DuPont] were a man.” As for Ratiner’s behavior during the deposition, DuPont complained that Ratiner, convinced that DuPont’s lawyer was coaching the witness during breaks, stated loudly enough for the witness to hear that he was “going to torture this woman.” Even a cursory review of the transcript of this deposition confirms that he attempted to do just that, constantly badgering the witness and making rude and vulgar comments including that he wished “the witness would quit scratching her crotch while [he] was talking to her.”
DuPont further claimed that Ratiner was equally unprofessional to DuPont’s counsel, aggressively grabbing his hand, then racing around the conference table in an attempt to physically attack that attorney because the attorney had attempted to affix an exhibit label to Ratiner’s computer. And when DuPont’s counsel asked Ratiner to stop continually spitting what appeared to be tobacco into a cup because it was very disconcerting, Ratiner childishly responded “can you remove that large booger hanging from your nose? It’s extremely disconcerting to me.”
While the court below declined to sanction the Sidrans’ attorney for this behavior, it nonetheless admonished him for this unprofessional behavior:
Returning to the substantive issue under consideration, this court has reviewed the written transcripts of the deposition of Deborah Naylor, and a videotaped excerpt of her deposition, and such review has convinced this court that Mr. Ratiner acted aggressively and threateningly during the deposition, and that his extreme conduct exceeded the bounds of professionalism. The video shows Mr. Ratiner forcefully grab Mr. Sherouse’s hand to take a sticky note away from Mr. Sherouse, and then start to aggressively make his way around the table until he is apparently held back by his expert consultant. Such behavior is clearly inappropriate and unacceptable in every way. The court also viewed a videotaped excerpt from a deposition in Borek, another Benlate case, in which Mr. Ratiner can be heard screaming at *639 opposing counsel in a very disconcerting manner, which demonstrates that such aggressiveness during depositions has been an ongoing problem for Mr. Ratiner. Although less extreme than his physical aggression, it was also very inappropriate and unprofessional for Mr. Ratiner to make rude comments to and about opposing counsel and the witness, and to chew tobacco during the deposition. This court wishes to make it very clear that it strongly disapproves of such behavior on the part of Mr. Ratiner, and that it cannot be allowed to continue.
DuPont renewed its efforts to sanction the Sidrans’ attorney for his unprofessional conduct, after learning that he had threatened to use a gun during a settlement conference in an unrelated case. This time, DuPont claimed that it had been advised by attorney Richard Morgan that during a settlement conference Ratiner had pulled out a gun and told opposing counsel “as a Jew you must know what it’s like to have a gun pointed at you.”
Attached to this motion were the sworn declarations of three lawyers, two of whom were then counsel of record for DuPont, who had participated in at least one conference call with Mr. Morgan during which he detailed the incident in which Ratiner purportedly pulled a gun and made this comment. Among other things, these declarations represented that after learning of Mr. Morgan’s experience with Ratiner, DuPont’s attorneys had called Mr. Morgan who, during a conference call, not only “confirmed that Ratiner pulled out a gun during a settlement conference” and said, “as a Jew you must know what it’s like to have a gun pointed at you,” but also had called Mr. Morgan’s client, who was present, a “f — king whore.” Additionally, Mr. Morgan advised that during a later telephone conversation with one of Mr. Morgan’s female associates Ratiner had said “when you’re home at night f — king your husband I know you’re thinking of me.”
On August 9, 2007, DuPont’s second motion for protection was heard. By that time, Mr. Morgan had had a session with his “in house counsel” about his accusations. He also had been subpoenaed by Ratiner to appear at the hearing. Although the settlement conference at which Ratiner had allegedly pulled a gun and made these statements had occurred only about thirty days before, Mr. Morgan, as the trial court noted, suddenly had memory problems. Thus, while he could not recall seeing Mr. Ratiner actually pull a gun or telling DuPont’s three attorneys during a conference call that Ratiner had done so, he was able to recollect seeing a gun in the room during the settlement conference and hearing Ratiner tell his partner a number of times “go get a gun.” He also distinctly remembered his client and associate crying after they returned from the settlement conference.
Morgan’s memory was, however, somewhat better with regard to comments made by Ratiner to his client, whom Ratiner called a “f — king whore,” to his Jewish associate, Douglas Libbie, to whom the “gun pointed at a Jew comment” was directed, and later to his associate to the effect that she would be thinking of him (Ratiner) while having sex with her husband.
This time, DuPont’s motion for protection was granted, with the trial court stating that it would be attending all depositions in the future. The trial court also decided to refer both DuPont’s counsel, Mr. Sherouse, and Ratiner to the Florida Bar for disciplinary action. Mr. Sherouse was referred for “pushing Ratiner’s] buttons” at the Naylor deposition by trying to put a sticker on Ratiner’s computer. Ra-tiner was referred for his inappropriate and bullying behavior during the video *640 taped deposition of Ms. Naylor and because even having a gun at a settlement conference was inappropriate.
In March of 2008, the grievance committee of The Florida Bar found no probable cause against Mr. Sherouse and dismissed the complaint against him. That same month, the grievance committee found probable cause existed against Ratiner and the matter was referred to a hearing referee. On November 12, 2008, the grievance committee referee recommended that Ra-tiner be disbarred or, alternatively, that he receive a two-year suspension from the practice of law for his behavior stemming from Mr. Sherouse’s attempt to place a sticker on his computer:
Earlier in the day Mr. Ratiner sought to and did place an exhibit sticker on the deponent’s [Ms. Naylor’s] personal laptop computer. There was not any outburst from opposing counsel. Neither opposing counsel nor the deponent stood up and threatened to “defend their computer with their life[,”] as Mr. Ratiner later would. Here, Mr. Ratiner grabbed the arm of the attorney, began to charge around the table — only to be restrained by God only knows what. Mr. Ratiner maintains that Ms. Naylor doesn’t look like she is afraid in the video. Her composure speaks for itself. Mr. Ratiner’s own expert attempted to calm him down and stated, “take a Xanax.” The court reporter cried out “I cannot work like this.” If Ms. Naylor was not afraid, she should have been. Then, not to be deterred, Mr. Ratiner embarked on a verbal tirade, while balling up the exhibit sticker and flicking it at opposing counsel. Then, while leaning forcefully over the table, and in a moment of pure psychological projection, Mr. Ratiner announced to Mr. Sherouse, “You are going to go before the Board (sic) Ethics Committee on this one, son. We are going to quit the deposition right now so you can rethink what you are doing.”
(Citations omitted).[18]’[19] The Florida Supreme Court ultimately would reject these recommendations and impose only a sixty-day suspension coupled with a public reprimand followed by a two-year probation. The Florida Bar v. Ratiner, 46 So.3d 35, 42 (Fla.2010).
The Sidrans’ Claims of a Sham Depository Come To a Head
Finally, in March of 2010, the Si-drans’ claims of sham depository and *641 fraudulent discovery finally came to a head. Working from its ex parte investigation with the Sidrans’ counsel of DuPont’s computerized data bases, the court below determined — without taking a word of evidence or allowing DuPont to articulate its position — that “[i]t is clear that DuPont represented its Depository and Collection to be reliable and complete, and that it intended for plaintiffs filing Ben-late claims, (as well as the Courts presiding over such claims), to rely upon their accuracy and completeness.” This determination was based on the trial court’s conclusion that: (1) DuPont’s own attorneys relied on the Depository/Collection for responding to discovery requests; (2) Ms. Naylor had testified that these collections were as complete for plaintiffs’ counsel as they were for DuPont; (3) DuPont had “strongly indicat[ed]” in a case pending in Lake County (the Fuzzell case) that Ratiner would have every possible document that “he might desire”; (4) and that by providing Ratiner with copies of DVDs of its document Collection in the Crew, Borek and Stano cases, DuPont was representing that it was providing him “with every possible Benlate document that he might desire.”
These conclusions are not supported by evidence adduced or representations made in this case. The record or “evidence” in this case consists of repeated representations by DuPont that it had made diligent efforts since 1992 to collect all Benlate-related documents from every available source and that DuPont had used those documents and made them available to plaintiffs for discovery in hundreds of Ben-late cases; that from time to time DuPont had to return to an original source or locate additional sources, either in-house or outside, to respond to discovery requests; and that in turning over the CDs and DVDs of its document Collection, it was providing Ratiner with everything that it had collected — not everything that could possibly exist in the files of thousands of employees located world-wide — in an effort to satisfy counsel’s discovery requests.
Unsworn statements by DuPont’s counsel in other cases to the effect that it was inconceivable that plaintiffs’ counsel should need any more documents once it had provided CDs and DVDs encompassing over 5 million Benlate-related pages, is not evidence. These unsworn statements are not evidence that these CDs and DVDs encompass every Benlate-related document that might conceivably exist anywhere amongst DuPont’s thousands of employees or in the possession and control of anyone else everywhere in the world, and they certainly are not evidence that it was inconceivable that Mr. Ratiner could not think of any additional documents to request.[20] Rather, these statements are nothing more than an expression of frustration with Ra-tiner’s demands for more and more documents and accompanying complaints that DuPont was not complying with his demands.
In short, the fact that DuPont relied on its own document collection for the purpose of responding to discovery requests and made those collections available to plaintiffs’ lawyers is not evidence, when considered alone or in conjunction with statements made by counsel in other cases, that DuPont represented as a fact that every conceivable document in DuPont’s possession on the subject of Benlate was in those sources.
*642 DuPont Ordered to Appear at May 14, 2010 Show Cause Hearing
Having determined that DuPont had represented that its Depository and Collection were complete, accurate and reliable, and that outside counsel were arguably urged to rely only on those collections for discovery purposes, the court below ordered DuPont to appear for an eviden-tiary hearing on May 14, 2010:
[to] show cause why the Court should not strike DuPont’s pleadings for engaging in a scheme to mislead the plaintiffs in the instant case and others by making it appear that DuPont was cooperating with the plaintiffs and providing them with relevant documents to have been discovered, while actually engaging in a process of obfuscation, setting up a system to make it difficult or impossible for the plaintiffs to find relevant documents within its massive collection.
(Footnote omitted). In conjunction with this show cause order, DuPont was ordered to address the following issues:
• Why a few pages from research assistant Sid Davidson’s notebooks had not been included in the 5 million page Benlate Document Depository when the remainder of the Benlate-related notebooks were first included in it;
• Why approximately 3000 pages (out of 5 million pages) were labeled as “missing” in the Collection and how did the individual coding documents into the Collection’s search fields decide where and why to code a page as “missing”;
• Why documents relating to the compound flusilazole were not included in DuPont’s document collections;
• Why DuPont’s document collections contained so many duplicates and how many exact duplicates were there; and,
• Why and how did DuPont select the Virtual Partner software system it used to access its document Collection.
The trial court additionally ordered DuPont to produce 347 documents labeled as “non-responsive” which the trial court had located during its in camera examination of the Collection database. While the court expressly stated that it found nothing sinister about these documents, documents labeled “non-responsive” would later prove to be the primary underpinning of the ultimate sanction imposed in this case.
On May 14 and again on June 11, 2010, DuPont appeared and presented testimony to address each of the concerns expressed in the court’s show cause order. The Si-drans introduced no evidence at those hearings. With regard to the court’s concern that DuPont had established and maintained a document collection system intentionally made difficult to use thereby perpetrating a fraud on the court, DuPont adduced the testimony of Sharon Chew-Woodhouse, the legal assistant who testified, as already stated supra, how documents were collected, organized and managed beginning in 1992.
As this witness confirmed, the purpose of this collection was to assist DuPont’s attorneys in responding to discovery demands as expeditiously as possible considering the number of cases and nature of the documents involved. No one at DuPont ever instructed her to destroy or to hide any document nor had she ever, in all her years at DuPont, seen anyone so act. This testimony was unrebutted and the Sidrans presented no evidence or testimony to establish that these collections were established or maintained with any fraudulent intent.
As for DuPont’s selection of Virtual Partner as the electronic database to store its document Collection, Jim Miehalowiez, a non-lawyer member of DuPont’s legal support team, testified that in 1999, with *643 electronic platforms for document and discovery management finally becoming available, DuPont decided to transfer its paper document collection, the Benlate Document Depository, to an electronic format. To accomplish this goal, DuPont appointed a committee comprised of lawyers, paralegals and other members of its in-house legal department, as well as a number of outside legal counsel and information technology specialists, to investigate and make that selection. According to Mr. Micha-lowicz, as part of its investigation, the committee contacted other law firms and large companies with similar document management requirements to determine how they managed them. The committee also conducted market research on available document management platforms and ultimately narrowed its search to two systems, one marketed by Steelpoint, the other by Dati-con. After running a pilot program using both platforms, DuPont determined that Daticon’s Virtual Partner was the best platform on the market to manage its Ben-late-related documents.
The propriety of this choice was confirmed by John Jessen, the founder of EED (Electronic Evidence Discovery), an entity that has produced electronic discovery platforms since 1987. Mr. Jessen testified that at the time DuPont selected Daticon’s Virtual Partner platform it was a leading product for discovery document management. As for the trial court’s concern that this program was “appallingly slow and inefficient,” Mr. Jessen testified that when operated in the manner intended in 1999, that is, with the program loaded into a master computer with three or four in-house terminals connected to it, this program worked well. However, because of advances in technology over the years, the program now was being operated from an in-house server accessed by numerous outside computers either via hard wire or the internet, requiring additional security (passwords and firewalls) and “connectivity” (additional telephone lines or additional bandwidth) all of which often made it slower and more difficult to operate. Additionally, Mr. Jessen testified that when searching a collection comprised of millions of documents such as DuPont’s Benlate Collection, it was going to take “lots of time” to complete even a narrowly, well-drawn search. This testimony, like that of Ms. Chew-Woodhouse, was unre-butted and in the absence of any contrary evidence, further supported the conclusion that there was no fraudulent intent by DuPont in the manner in which these document collections were created, organized or managed.
As to why a- few pages from one of Sid Davidson’s notebooks were not initially included in the document Depository or searched for when the Sidrans initially requested information relating to soil-borne bacteria, the response was straightforward: they were inadvertently overlooked in the early 1990s when all of the scientists’ notebooks were reviewed and then later discovered by chance in 2007. According to the testimony of Dr. Charles Delp, the DuPont scientist known as the “father of Benlate,” he was called out of retirement in 1992 when the Depository was being established to review “all” of DuPont’s scientists’ notebooks[21] to locate those having to do with benzimidazole (the active ingredient in Benlate) and Benlate T1991 (the final formation of that product) for inclusion in the Benlate-related Depository.
*644 To accomplish this, Dr. Delp asked all supervisors and laboratory directors to have anyone who worked on Benlate at any time to provide their notebooks to him. In response, he received approximately 1500 notebooks, including those from Sid Davidson whom Dr. Delp supervised. Then, over a two-year period, Dr. Delp reviewed the notebooks tabbing what he believed to be all portions of all notebooks relating to Benlate. While it appears that Dr. Delp may have failed to include the few pages at issue here regarding soil borne bacteria, there is no evidence that anyone at DuPont asked him not to include these pages or that he intentionally did not do so. Based on the testimony of Dr. Larry Peterson, it appears that Dr. Delp did not consider them related to Benlate and thus did not include them.
According to Dr. Peterson, who holds a Ph.D. in plant physiology and biology, as well as Masters degrees in botany, marine science, and agronomy, he was called in by DuPont in 2007 to assist with the Sidrans’ request for documents related to “soil borne bacteria.”[22] During his search for documents in Virtual Partner, Dr. Peterson came across an e-mail which referred to a notebook detailing a test performed by Sid Davidson on a specific bacteria implicated in a Japanese claim. When Dr. Peterson was not able to find the notebook referred to in the e-mail, he located all of the notebooks and found ten of Davidson’s notebooks that were not included in the Collection. He sent these notebooks to a plant pathologist at Stine Laboratories for a page by page review to determine whether any portion of them related to Benlate and soil borne bacteria. The result: only two pages from these ten notebooks related to Benlate, and although Dr. Peterson determined that these pages (which determined that Benlate did not appear to be an effective bacteriacide) were wholly irrelevant to any claim made in any Benlate case, he nonetheless had the pages included in the Collection. Thus, the reason these two pages were not initially included in the Depository, but were later included in the Collection was first that they were either overlooked or deemed not related to the fungicide Ben-late but later included in an overabundance of caution in response to a request for information regarding bacteria.
As to how DuPont decided which of the millions of documents it possessed related to flusilazole it should include in the Depository and the Collection, the evidence was that this compound is not an active ingredient of Benlate (like thousands of other compounds developed and marketed by DuPont) and not initially (in 1992) included in the Benlate-related Depository because it was unrelated to Benlate. However, in 1998 after it was discovered that some lots of Benlate had been contaminated by scientifically insignificant amounts of flusilazole (another fungicide used in other products), DuPont was ordered by a General Master to include, and included, documents relating to the contamination in the Depository.[23]
With regard to the trial court’s concerns about pages labeled “missing” in the Collection, Ms. Chew-Woodhouse explained *645 that during the massive copying and stamping of millions of pages of documents by a substantial number of manual laborers during the creation of the Benlate Document Depository, from time to time pages were “eaten” by a copier machine, labels inadvertently were ripped off, and documents were jumbled when dropped or misplaced. Ms. Chew-Woodhouse also testified that the Bates-stamping machine would sometimes stick, stamping a single page a number of times, or simply skipping a page, causing gaps in the numbering, errors that staff did not always bring to the attention of supervisors. However, when such gaps were discovered during quality control reviews, Ms. Chew-Wood-house would first try to discern whether a page or document truly was missing or simply a glitch in the numbering system, and then try to locate a page or document by contacting its source (if it could be determined) to get the document or page back. Where, however, a number gap could not be resolved by this method, a page labeled “missing” was inserted.
As to why the Depository and Collection contained so many duplicates, the testimony was that documents were collected from and then organized and maintained by source. Because many sources maintained copies of the same documents, many duplicates naturally occurred in the document Depository and in the Collection. Moreover, according to expert testimony, the existence of duplicates in the document collections was a positive indication of little “self-editing,” which left it to those using the collection to determine the significance of a document’s placement ,or marginalia on a copy of a document.
With regard to the court’s inquiry as to how many “exactly identical” documents were included in the Depository and the Collection,[24] a specialized computer analysis of the Collection was conducted by an outside consulting firm which established that out of the 857,837 documents it examined from the Collection, only 58,185 (approximately 7%) are exactly identical. When “similar” documents (that is, documents basically the same but with minor differences such as marginalia) were added, the total number of “duplicate” documents rose to 144,033 (approximate 11%). According to the consultant who performed this study, these percentages were not unusual because duplicates in a collection this size typically comprised about 30 percent of the collected documents.
Finally, with regard to the trial court’s order that DuPont produce 347 documents that it had identified as “non-responsive,” by the time of the first hearing on the motion to show cause, DuPont had produced all 347 of the documents that the court below had ordered produced, which entailed the production of almost 30,000 additional pages. Despite this compliance, the court below demanded to know why DuPont was using databases other than the Benlate Collection database to locate documents — such as the Gutter files (files from a securities case wholly unrelated to Benlate) and DuPont’s Su Ag files (related to a compound also wholly unrelated to Benlate). Obviously, if a document was not related to Benlate — that is, it was “non-responsive” — it was not in the .Ben-late-related document Collection and had to be located elsewhere. And although the Sidrans attempted to use some of the “non-responsive” documents produced pursuant to the show cause order to demon *646 strate that DuPont was withholding responsive documents by labeling them as non-responsive, DuPont was able to show that these documents had not been withheld, ' but had previously been provided during discovery. In short, the documents produced pursuant to the show cause order, while marked as non-responsive in some index of the Collection, most likely were duplicates and could be located elsewhere in the Collection.
At the conclusion of the rule to show cause hearings, the matter was taken under advisement.
The January 19, 2011 Order Under Review
On January 19, 2011, the court below entered the order striking DuPont’s pleadings and entering a default against it for perpetrating a fraud upon the court. That order was premised in part on the court’s earlier determination that DuPont had represented its Benlate Depository as complete and reliable and had done so with the intent that Plaintiffs rely on those representations to their detriment:
The Court has already, in [its earlier order] concluded that DuPont represented the collection to be reliable and complete and that it intended plaintiffs and courts to rely upon those representations.
The court then determined, purportedly based on the evidence adduced at the two show cause hearings, that the Depository and the Collection were not complete and had been manipulated to make them less than reliable thereby committing a fraud on the court.
These conclusions were based primarily on four findings. First, the court found that DuPont had falsely represented “that the documents removed from its depository and collection as ‘non-responsive’ were irrelevant to Benlate litigation and ‘had absolutely nothing to do with Benlate.’ ” This finding is not supported by the record or by the evidence adduced at the show cause hearings. While the testimony from both DuPont representatives, Ms. Chew-Woodhouse and Ms. Naylor, was that this “non-responsive” label did denote documents that had been included in the collection but later removed because not relevant, that was not the only use of that label. To the contrary, the uncontradicted testimony was that the term “non-responsive” was used (perhaps improvidently) not only to identify documents not related to Benlate, but also to indicate that a duplicate document existed. In point of fact, the fifty-one documents utilized by the trial court in its sanction order to support its conclusion that relevant documents falsely had been labeled “non-responsive” and removed from the Collection confirm the accuracy of Chew-Woodhouse and Naylor’s testimony. All but four of the documents were not removed from the Collection as irrelevant, non-related or otherwise, but indeed were included in the Collection and could be located via search fields other than the one in which the “non-responsive” label appeared. Moreover, all of these documents already had been provided to counsel for the Sidrans. As to the other four documents, even if these proved to be relevant but excluded from the Collection, this sample, out of 800,000 documents and 5 million pages, hardly serves as support for a finding that DuPont’s designation of documents as “non-responsive” constituted a “willful” manipulation that would support a finding of a fraud on the court.
The same can be said of six other documents identified by the trial court in the sanction order which had been deemed “non-responsive” by DuPont and not produced, but which appeared to the court to be “highly relevant to Benlate litigation.” It is difficult to understand how it determined — in the absence of a document *647 that had not been produced — that a document titled “TEST ON SORGHUM” and a document titled “LITERATURE ON EFFECTS OF SULFONYLUREA HERBICIDES ON ORNAMENTALS® VEGETABLES CROPS” are in any manner related to Benlate much less “highly relevant to Benlate litigation.” This issue certainly was not explored at the two evi-dentiary hearings on the show cause order. It is equally unclear how the trial court discerned that tests on Blue Rug Junipers, Blue Pacific Junipers, and Petunias, again in the absence of the documents, were “highly relevant.” More to the point, the trial court was advised pri- or to issuance of the sanction order that all but one of these documents, which is privileged, had been provided to counsel for the Sidrans and that the five non-privileged documents were either duplicate documents included elsewhere in the Collection or detailed information found in other documents in the Collection. In sum, documents labeled “non-responsive” provided no support for the entry of a finding of fraud on the court.
Second, the trial court concluded that because DuPont was “self-editing” its database, it was incomplete and unreliable. There is no record support for this finding. Rather, this conclusion rests on the trial court’s ex parte determination that by subtracting the number of documents in the Collection database as attested to at the show cause hearing in 2010 (857,837 documents) from the number of documents the trial court counted during her independent investigation in 2008 (871,098 documents), approximately 13,000 fewer documents were in the Collection database in 2010 than in 2008, thereby proving self-editing. This is not only untested speculation, but it is also not proof of improper manipulation.
In fact, there is no evidence as to how the trial court’s number was derived. There is no evidence as to which databases the trial court counted, how it counted the number of documents, and whether that count was accurate.[25] There is, therefore, no way to know whether the comparison which the trial court made between its count and that of the consultant who testified as to the number of duplicates it determined were included in the Collection database, compares apples with apples. In short, the conclusion that DuPont was manipulating its databases because the number of documents decreased between the trial court’s extra-record count in 2008 and the number used by a consultant in 2010 for the purpose of determining the number of duplicate documents existed is wholly unsupported by any evidence, is based on untested speculation and provides no confirmation for the validity of the sanction imposed.
Third, the trial court concluded that DuPont’s failure to initially include two notebook pages from a single scientist’s notebook further confirmed that a sinister plan on DuPont’s part was afoot. This circumstance confirms no such thing. The testimony below was that while these two pages appeared to have been overlooked initially or correctly were deemed wholly irrelevant and not worthy of inclusion, they later were included. Thus, the failure to include these two pages, whether by mistake or because they could not possibly be related to anything relevant, provides no support for concluding that DuPont’s document collections were so purposely unreliable that its pleadings should be stricken for fraud on the court.
*648 Fourth, the trial court concluded that DuPont committed a fraud on the court because the court’s computer network was unable to maintain access to DuPont’s in-house computer system:
Prior to the Court’s in camera review of DuPont’s databases, it ordered DuPont to provide it with the same ability that DuPont has to research its Benlate-related databases. As the Court stated in its “order on Plaintiffs’ Motions Alleging that DuPont’s Benlate Depository is a Sham,” it found the system with which it was provided access to be appalling slow and inefficient. Therefore, it ordered DuPont to explain how and why it chose that system.
Essentially, DuPont’s position is that its database system, Virtual Partner, is a good system, and that connectivity issues on the Court’s end cause the slowness and inefficiency that the Court experienced.... However, DuPont did not inform the Court of the potential connectivity and efficiency issues that it would face at the time of the in camera review. Indeed, DuPont was ordered to provide the Court with the same ability that DuPont had to search its Benlate-related databases ....
Thus, the situation exists where DuPont represented to the Court at the time that it was providing the Court with the same access that it and its attorneys had....
Since a witness from outside DuPont testified that Virtual Partner is a good system and DuPont’s other witness testified that he is able to connect to it with no problem, this court finds DuPont’s current representation persuasive. This means that DuPont failed to comply with the Court’s order to give it the same access that DuPont has. DuPont is subject to sanctions for failing to comply with a Court order. The failure to comply with the Court’s order was coupled with a misrepresentation that DuPont was providing the Court with the same access that it and its attorneys had, which has been established not to be true by DuPont’s evidence. This misrepresentation is also a basis for a finding of fraud on the Court.
We readily reject this conclusion because the shortcomings of the trial court’s internal computer and internet systems cannot be laid at DuPont’s door much less support a finding of fraud. The facts relating to this determination are undisputed. Pursuant to court order, DuPont provided the trial court with a computer loaded with the proprietary software that it licensed. That computer and program were the same as that used by DuPont’s counsel to access documents in Virtual Partner. DuPont also provided the services of the attorney who used this program to access Virtual Partner from Miami. It also provided the passwords needed to access the program as well as the services of an IT expert to assist the court connecting to the program. Having done all that, the trial court was able to sit with counsel for the Sidrans and use this program long enough to identify 347 “non-responsive” documents and to count the number of documents in a database encompassing over 800,000 documents. On this record, we find no support for the conclusion that because others had no problem accessing the Virtual Partner from outside while the trial court had “connectivity” problems in doing so, DuPont failed to provide the trial court with the same access it accorded others and therefore made misrepresentations to the court below, thereby committing a fraud.
Finally, we reject the trial court’s reliance on a few cases from other jurisdictions in which DuPont has been sanctioned *649 for discovery violations as evidence that it knew that its document collections were incomplete and unreliable and that its methods for searching them were inadequate. The shrimp farmer cases, on which the trial court primarily relied as an example, highlights exactly what is missing in this case: evidence that DuPont withheld relevant documents thereby prejudicing the Sidrans. In the shrimp farmer cases, the plaintiffs established the “factual relevance” of specific documents “wrongfully withheld” during discovery.[26] See Aquamar S.A., 2007 WL 7262875 (“With the establishment of the factual relevance of the withheld studies and memos, the plaintiffs have now supplied the missing element to demonstrate that they were prejudiced by the defendant withholding the documents.”). This is the antithesis of what happened here — that is, pre-trial, the Sidrans made an open-ended claim of a scheme, and no needed documents were specified or their relevance established. Indeed, at oral argument, counsel for the Sidrans was asked whether there was any indication from any document produced that anything of significance had not been produced or was missing. The answer was “no.”[27] Thus, at best the shrimp farmer eases confirm only that in those cases when DuPont’s counsel failed to produce relevant documents, they were sanctioned appropriately. These cases do not confirm that DuPont’s document collections are so incomplete and unreliable as to constitute a fraud on the court in this case.
In short, whether considered alone or together, none of the trial court’s findings support a conclusion DuPont either manipulated its document collections to interfere with the ability of these or any other plaintiffs to “participate in the discovery process,” or that the entire 800,000 plus document, 5 million page collection is so incomplete or unreliable for the its intended purpose so as to subject DuPont to *650 sanctions for perpetuating a fraud on the court.
Conclusion
“Fraud on the court occurs where ‘it can be demonstrated, clearly and convincingly, that a party has sentiently set in motion some unconscionable scheme calculated to interfere with the judicial system’s ability impartially to adjudicate a matter by improperly influencing the trier of fact or unfairly hampering the presentation of the opposing party’s claim or defense.’ ” Ford Motor Co. v. Stimpson, 115 So.3d 401, 405 (Fla. 5th DCA 2013) (quoting Robinson v. Weiland, 988 So.2d 1110, 1111 n. 1 (Fla. 5th DCA 2008) (quoting Cox, 706 So.2d at 46)); accord Aoude, 892 F.2d at 1118. As this court has stated, “[i]t is not uncommon for the reviewing court to reverse a dismissal with prejudice based upon a finding of fraud upon the court in the absence of misconduct that proves an ‘intent to deceive,’ or misconduct that was ‘willful’ in nature and done in ‘bad faith.’ ” Bertrand v. Belhomme, 892 So.2d 1150, 1153 (Fla. 3d DCA 2005); see also Bob Montgomery Real Estate v. Djokic, 858 So.2d 371, 374 (Fla. 4th DCA 2003) (reversing dismissal and observing “[t]he record reflects nothing but tenuous and conflicting evidence about the claims of misconduct”).[28] Here, DuPont always made it clear it was providing litigants only what it had and that the Depository/Collection was an evolving collection. Additionally, and equally determinative, the Sidrans wholly failed to establish by clear and convincing evidence, that there was an “intent to deceive” or misconduct that was “willful” in nature or done in “bad faith.” The order on appeal is therefore reversed and the cause remanded for an expedited trial on the merits of the plaintiffs claims with no further amendments and no additional discovery to be permitted.
Reversed and remanded with instructions.

On Motion for Rehearing and Clarification

On consideration of the Sidrans’ motion for rehearing and clarification and DuPont’s response, we grant the Sidrans’ motion, in part. This Court’s opinion filed April 23, 2014 is corrected solely as to the *651 penultimate sentence of that opinion which should read:
The order on appeal is therefore reversed and the cause remanded for an expedited trial on the merits of the Si-drans’ liability claims and DuPont’s defenses thereto, with no further amendments.

. DuPont actually appeals four orders issued below: (1) the "Order On Plaintiffs' Motion For Sanctions And Court’s Rule To Show Cause” (striking DuPont’s pleadings and entering a default judgment in favor of the Plaintiffs and ordering a trial to proceed on damages only); (2) an "Order On DuPont’s Motion For Clarification Regarding DuPont's *622 Liability For Punitive Damages In [A] January 19, 2011 Order” (concluding "liability for both compensatory and punitive damages was established”); (3) an "Order Denying Plaintiffs' Post-Trial Requests For Additional Sanctions” (denying additional sanctions but granting "Plaintiffs Renewed Objection to Entry of Exhibit 46 into Evidence;”); and, (4) the "Final Judgment.”

. Three suppliers and/or distributors were also joined in this action, OFE International, Inc., Asgrow Florida Company, and V-J Growers Supply.

. This claim was brought through "Plaintiffs’ Motion for Sanctions Against DuPont for its Creation of a Sham Depository for the Appearance of Being Responsive in Discovery,” filed on behalf of the Sidrans, as well as the plaintiffs in four other pending cases: Native Hammock Nursery v. E.I. DuPont De Nemours and Co., Borek v. E.I. DuPont De Nemours and Co., Crew Farms v. E.I. DuPont De Nemours and Co., and Strano v. E.I. DuPont De Nemours and Co. The trial court struck DuPont’s pleadings and entered a default judgment for the Sidrans and for the plaintiffs in each of the four other separate cases.

. See, e.g., Aoude v. Mobil Oil Corp., 892 F.2d 1115 (1st Cir.1989) (concluding that service station operator's conduct in fabricating a purchase agreement and in allowing his counsel to annex a bogus agreement to a complaint seeking to force franchisor to accept his operation of station constituted fraud on the court warranting dismissal of action).

. See Tramel, 672 So.2d at 84 (“The intentional destruction or alteration of evidence undermines the integrity of the judicial process and, accordingly, may warrant imposition of the most severe sanction of dismissal of a claim or defense, the striking of pleadings, or entry of a default. Metropolitan Dade County v. Bermudez, 648 So.2d 197, 200 (Fla. 1st DCA 1994).”).

. The facts here distinguish the Sidrans’ claim of fraud on the court from a case such as Empire World Towers, LLC v. CDR Créances, S.A.S., 89 So.3d 1034 (Fla. 3d DCA 2012), where we concluded that the striking defendants' pleadings and entry of default judgment against them was warranted as a sanction for their conduct in defrauding the court by producing fabricated corporate documents, by committing perjury in affidavits and depositions, by suborning the perjury of material witnesses during depositions and in affidavits, and by providing witnesses with scripts of lies to repeat under oath during depositions. Similarly demonstrating a very different factual scenario is Philips Electronics North America Corp. v. BC Technical, 773 F.Supp.2d 1149, 1211-12 (D.Utah 2011), where the court struck defendant’s answer, dismissed its counterclaims, and entered default judgment as to liability in Philips' favor, observing:
Here, BCT executives and employees purposefully deleted, then wiped, shredded, and overwrote files from their computer hard drives after learning of the court’s order compelling BCT to produce its ESI and/or just before the computers were turned in to be imaged by Lighthouse. After this behavior, several employees and executives — including BCT’s Chief Technical Officer — lied about their behavior in their depositions, sworn declarations, and/or in the Hearing, in an apparent attempt to commit fraud on this court. Further, BCT’s CETO (and Founder) and COO also lied under oath during the investigation into the missing ESI. BCT flouted this court’s authority and willfully disregarded this court’s orders to turn over its ESI and to stop wiping hard drives.
Philips, 773 F.Supp.2d at 1211-12.

. As the trial court’s order reflects, the underlying premise of the Sidrans' motion to strike and the trial court's order striking DuPont’s pleadings is that DuPont represented that its document Depository and Collection were a complete collection of documents upon which Plaintiffs' attorneys should rely to their detriment:
In the instant case, the Plaintiffs' overriding theme is that DuPont presented the depository and collection as a complete collection of documents related to Benlate with the intent that Plaintiffs would rely upon its completeness to their detriment. ...
[[Image here]]
If the Plaintiffs' allegations are accurate, DuPont misled not only the Plaintiffs, but also the court....

. DuPont also employed Quorum, a litigation support company, and many individuals from other states to do this work.

. With millions of documents to index, this made sense especially considering the nature of the documents involved. Unlike a trial court docket listing pleadings or motions, this collection of documents was comprised of thousands of letters, memoranda, scientific data and test results, and other writings not so easily described in a few words.

. On November 24, 2001, in connection with the Fuzzell v. DuPont, Strano v. DuPont, Borek v. DuPont, and Crew Farms v. DuPont cases, DuPont had voluntarily provided the Sidrans’ counsel with DVDs containing images of documents in DuPont's non-privileged Benlate Document collection:
DuPont, at its own expense, is voluntarily providing you with DVDs containing images of the documents in DuPont’s non-privileged Benlate® Document Collection. ...
There are seventy DVDs enclosed with this letter. The images on these DVDs comprise the non-privileged Benlate® Document Collection as of this date and the non-privileged documents related to the Gutter Shareholder Litigation. [On May 28, 2004, we provided you with an electronic, researchable version of an index to the Gutter Shareholder Litigation documents.]. Fifty-seven of these DVDs are copies of DVDs that were created in September, 2003, and produced in litigation pending in Hawaii. Since September 2003, some privileged documents have been downgraded to non-privileged status. Because this occurred after the DVDs were created, you will still see "pulled for privilege sheets” when attempting to view these documents on these fifty-seven DVDs. That should not present any issue for you because on June 29, 2004, we provided you with a list of the documents that had been downgraded along with a CD containing copies of those documents. To determine whether a document is privileged, all you need to do is review the privilege log and the downgraded list that we provided to you on June 29, 2004.
The DVDs do not contain images of photographs, oversized documents (for exam-pie, blueprints), the Crawford claims files, or the electronic media collection.
We are also enclosing for your convenience, a CD containing an electronic index of the documents being produced. Accessing the images on the enclosed DVDs requires a DVD reader. The DVDs you are receiving are DVD + RW.
You now have DuPont's non-privileged Benlate® Document Collection in electronic format with a searchable index. Although under no obligation to do so, DuPont has chosen to provide you with these materials at its own expense in a good faith effort to eliminate your constant complaining about discovery related matters as a means of avoiding having to tiy these cases....

. As Allstate Insurance Co. v. Langston, 655 So.2d 91, 94 (Fla.1995) explains:
Discovery in civil cases must be relevant to the subject matter of the case and must be admissible or reasonably calculated to lead to admissible evidence. Brooks [v. Owens ], 97 So.2d [693, 699 (Fla.1957)]; see also Amente v. Newman, 653 So.2d 1030 (Fla.1995) (concept of relevancy is broader in discovery context than in trial context, and party may be permitted to discover relevant evidence that would be inadmissible at trial if it may lead to discovery of relevant evidence); Krypton [Broadcasting of Jacksonville, Inc. v. MGM-Pathe Commc’ns Co.], 629 So.2d [852, 854 (Fla. 1st DCA 1993) ] (“It is axiomatic that information sought in discovery must relate to the issues involved in the litigation, as framed in all pleadings.”); Fla. R. Civ. P. 1.280(b)(1) (discovery must be relevant to the subject matter of the pending action).
*630 Accord Capco Props., LLC. v. Monterey Gardens of Pinecrest Condo., 982 So.2d 1211, 1213-14 (Fla. 3d DCA 2008); Barker v. Barker, 909 So.2d 333, 338 (Fla. 2d DCA 2005); Residence Inn By Marriott v. Cecile Resort Ltd., 822 So.2d 548, 549 (Fla. 5th DCA 2002); see also Fla. R. Civ. P. Rule 1.280(b)(1).

. Certain investigative files prepared by Crawford and Company for DuPont.

. This litigation related to a securities claim and was not Benlate related.

.Mr. Sherouse and Mr. Pagliery were DuPont's counsel of record at the time this demand was made. Mr. Maloney's name does not appear as counsel of record in this case, but is an attorney in the same firm as Mr. Sherouse and Mr. Pagliery.

. Counsel for the Sidrans made the same accusations of fraud, sham concealment and destruction of documents in Fuzzell v. DuPont, a Benlate case pending in Orlando. The court there refused to entertain any further obfuscation by the same attorney who represented the Sidrans (and four others here) and dismissed the action stating:
So why has this case been .in the court system since the first Clinton administration? ....
[[Image here]]
The court set this matter for trial at least twice and plaintiff begged off both times.
Finally in an effort to conclude discovery and although defendant readily admitted much of the information it had compiled was irrelevant to the case, it offered to turn such information over to plaintiff. The offer was accepted. Now plaintiff complains that defendant delivered a haystack, but did not include the needle. It may be that the needle — and the magic bullet sought by plaintiff — simply does not exist. And the court system cannot wait another twelve years to find out.

Discovery is not the purpose of litigation; it is an adjunct to it.

(Emphasis added).

. A party is not obligated to create a document or make a compilation of information for the opposing party. Nor do the rules obligate a party to do so for a court. See Allstate Ins. Co. v. Finder, 746 So.2d 1255, 1256-57 (Fla. 5th DCA 1999) (concluding a party is not "entitled to have another party respond to a request to produce by creating a non-existent document”); See generally Philip J. Padovano, "Requests to Produce” § 10:10 (West’s Fla. Prac. Series 2014 ed.) ("[A] party need not create a document that does not exist in order to comply with a request for production.”).

. Although these documents initially were included in the Benlate Collection, when it was discovered that these documents related to a securities claim, not a Benlate claim, they were removed from the document Collection as unresponsive and segregated in another document collection.

. In making this recommendation, the referee also noted: (1) Mr. Ratiner’s inappropriate behavior in meeting every complaint about his actions with some counter (most often inappropriate) complaint to level the "accusa-tional field” [For example, meeting the complaint about him spitting tobacco with the comment about a "booger.”]; (2) the impropriety of his vulgar comment to Ms. Naylor about scratching her crotch whom the referee found to be an educated, polite and patient individual and who described Mr. Ratiner’s behavior at her deposition as rude, abusive, sexually vulgar and degrading, making it one of the worst experiences of her life; (3) the court reporter’s testimony that Mr. Ratiner was both verbally and physically abusive to Ms. Naylor and to counsel and that when he tried to attack counsel over the placement of a sticker on his computer, she became afraid for her life; and (4) Mr. Ratiner’s threat to "torture” Ms. Naylor followed by hours and hours of what appeared to be unnecessary hounding.

. Despite the recommendation of the grievance committee referee in March 2008 that Ratiner be suspended or disbarred for his behavior, he continued to act in a wholly inappropriate manner. During a four-day document review in Wilmington, Delaware, Ratiner verbally abused and attempted to intimidate two female DuPont attorneys constantly calling them liars and accusing them of fraud. At one point, he attempted to forcibly wrest documents from one of these attorney’s hand causing a security guard to intervene.

. While these statements might possibly constitute a discovery violation, they did not go to any central or core issue in these negligence/products liability cases dealing with the formulation, manufacture and distribution of Benlate.

. These notebooks are not kept by subject matter, but are daily records of the work of any given scientist.

. We note that the Sidrans’ orchids were not grown in soil and that Benlate is a fungicide — that is, its purpose is to control fungi not bacteria.

. These documents demonstrate that the amount of flusilazole detected in the contaminated Benlate, 442 parts per million, was too insignificant to cause harm. Under EPA guidelines up to 1000 parts per million of cross-contamination is acceptable and the testimony was that to be scientifically meaningful in this case, at least 86,000 parts per million would have been necessary.

. These inquiries confirm that for DuPont it was a matter of “damned if you do and damned if you don’t.” DuPont was accused of both fraudulently failing to include all relevant documents in its collections on the one hand and then accused of fraudulently trying to hide relevant documents by including too many documents in the collections.

. DuPont was never put on notice that the trial court was going to conduct its own investigation to determine the number of documents encompassed in the Collection database.

. The underlying sequence of events in the "shrimp farmer cases,” cited by the trial judge below, is outlined in Molinos Del S.A. v. E.I. DuPont de Nemours and Co., 947 So.2d 521, 522-24 (Fla. 4th DCA 2006). The appellants in Molinos owned shrimp farms in Ecuador and in 1998 brought suit against DuPont involving Benlate, which had been used in banana farms near appellants’ properties. Two of the shrimp farmers, Aquamar and Dibsa went to jury trial, with Dibsa receiving a $14,315,599.17 judgment and Aquamar securing a $12,335,475 judgment. Both judgments were reversed on appeal and judgment in DuPont’s favor ultimately entered. See E.I. DuPont De Nemours & Co. v. Desarrollo Indus. Bioacuatico, S.A., 857 So.2d 925 (Fla. 4th DCA 2003), review denied, 869 So.2d 538 (Fla.2004); E.I. DuPont de Nemours & Co. v. Aquamar S.A., 881 So.2d 1 (Fla. 4th DCA 2004), cert. denied, 543 U.S. 1177, 125 S.Ct. 1335, 161 L.Ed.2d 162 (2005).
While these appeals were pending, Dibsa and Aquamar learned about two memoranda not produced by DuPont which ultimately led them to an EPA monitoring report relating to the environmental effects of Benlate run-off. Dibsa and Aquamar sought to sanction DuPont in the trial court, asking the trial court to strike DuPont's pleadings for alleged discovery violations. The trial court refused to consider the sanctions motions because it lacked jurisdiction. However, after the judgment in Aquamar was reversed (and judgment in DuPont’s favor entered), Dibsa and Aquamar filed Rule 1.540(b)(2) motions asserting essentially the same facts that formed the basis for their earlier motions for sanctions. These motions ultimately were granted nullifying the judgments in DuPont's favor because the documents withheld were relevant and the failure to provide them was deemed prejudicial.

. This case has been pending for twenty-two-years, and during that time the Sidrans have propounded literally thousands of discovery requests and received literally thousands of documents from DuPont. If there was anything of significance that had not yet been produced, the Sidrans surely would have suspected it by now and would have sought information regarding it from other sources.

. In Valerio v. Boise Cascade Corp., 80 F.R.D. 626, 641 (N.D.Cal.1978), the court explained:
"Fraud upon the court” should ... embrace only the species of fraud which does or attempts to defile the court itself, or is a fraud perpetrated by officers of the court so that the judicial machinery can not perform in the usual manner its impartial task of adjudging cases that are presented for adjudication.
7 Moore's Federal Practice P 60.33 at 512-13 (2d ed.1970). In summarizing the types of conduct that do or do not constitute fraud on the court, the court in United States v. International Telephone & Telegraph, 349 F.Supp. 22 (D.Conn.1972), Aff'd sub nom. Nader v. United States, 410 U.S. 919, 93 S.Ct. 1363, 35 L.Ed.2d 582 (1973), stated,
Generally speaking, only the most egregious misconduct, such as bribery of a judge or members of a jury, or the fabrication of evidence by a party in which an attorney is implicated, will constitute a fraud on the court. See Hazel-Atlas Glass Co. v. Hartford-Empire Co., 322 U.S. 238, 64 S.Ct. 997, 88 L.Ed. 1250 (1944); Root Refin. Co. v. Universal Oil Products, supra, 3 Cir., 169 F.2d 514; 7 J.W. Moore, Federal Practice, para. 60.33 at 510-11. Less egregious misconduct, such as nondisclosure to the court of facts allegedly pertinent to the matter before it, will not ordinarily rise to the level of fraud on the court. See Kupferman v. Consolidated Research & Mfg. Co., supra, 2 Cir., 459 F.2d 1072; see also England v. Doyle, 281 F.2d 304, 310 (9th Cir.1960).
Id. at 29 (emphasis added). See also Rozier v. Ford Motor Co., 573 F.2d 1332, 1338 (5th Cir.1978) (quoting IT &T).